[Civ. No. 35427. Second Dist., Div. Four. Oct. 21, 1970.]

MARTIN LUTHER HOMES, Plaintiff and Respondent, v.
COUNTY OF LOS ANGELES, Defendant and Appellant.

206

## COUNSEL

John D. Maharg, County Counsel, John D. Cahill and DeWitt W. Clinton, Deputy County Counsel, for Defendant and Appellant.

William A. Cruikshank, Jr., and Michael Antin for Plaintiff and Respondent.

## OPINION

**FILES, P. J.**—Plaintiff brought this action against Los Angeles County to recover property taxes on two lots for the 1964-1965 tax year paid under protest. It recovered judgment returning the taxes paid on both lots. The county appeals from this judgment.

The issue presented at the trial and on this appeal is whether these two lots were used exclusively for charitable purposes on the tax lien date (the first Monday in March 1964). If so, then the lots qualify for property tax exemption under Revenue and Taxation Code section 214 and California Constitution article XIII, section 1c.[1]

Although this case involves the taxation of only two improved residential lots, it was necessary for the trial court to examine the entire operation of plaintiff in determining whether its use of this property was

---

[1]California Constitution article XIII, section 1c, provides: "In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation all or any portion of property used exclusively for religious, hospital or charitable purposes and owned by community chests, funds, foundations or corporations organized and operated for religious, hospital or charitable purposes, not conducted for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."

Revenue and Taxation Code section 214 provides: "Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation. . . ."

exclusively charitable. There is no dispute that plaintiff was a nonprofit corporation organized in such a way that its property would be exempt under section 214 if used exclusively for a charitable purpose. There is no substantial conflict in the evidence as to what plaintiff did. Its eligibility for tax exemption is determined by applying the law to these facts.

Plaintiff was incorporated in 1960. Its immediate purpose was to provide low-cost rental housing for persons over the age of 60. On September 12, 1960, plaintiff purchased, under contract of sale, 81 lots of tract 19421 in Lancaster. Sixty-one lots were improved with duplexes and 20 lots with four-unit buildings. This housing had been constructed for workers in an aircraft plant, but the plant had ceased operations and there was little demand for residential property in that area. The builder sold the tract to plaintiff at a price of $1,570,371, with a down payment of only one dollar, and monthly payments starting at $1,000 and gradually increasing.

In 1963 plaintiff purchased 141 single family residences in tract 21659 in Palmdale. The seller was a lender who had taken the property from the original developer by foreclosure. The price was $1,232,000, with "practically no money put down," and monthly payments of $6,500. The 141 homes were scattered throughout the tract.

All of this property was lost to plaintiff in 1966 when, because of inability to keep up payments, it quitclaimed to the former owners.

Plaintiff's method of operation was described by the trial court in its findings as follows:

"7. From the dates of the acquisition of such properties by plaintiff until it quitclaimed its interest therein in May, 1966, plaintiff generally leased the apartments and single family houses to able-bodied physically self-sufficient individuals, couples or families (although several units were leased to disabled persons) exclusively for their housing and residential use. The rental lease executed by plaintiff with its tenants specifically provided that the property had to be used 'exclusively for residential purposes only' and that was the only use made of the property.

"8. Although there were exceptions, plaintiff's intended plan was to lease the premises to individuals over the age of 60 years or to couples one of whom was in excess of that age. This plan, however, was not fully implemented as to the Palmdale houses.

"9. On the first Monday in March, 1964 (the 1964 assessment and tax date), the 202 apartment units in Lancaster were used as follows:

| | |
|---|---|
| Residence for the deaconess in attendance | 1 unit |
| Community center | 2 units |
| Leased to persons under 60 years of age | 5 units |
| Leased to persons or couples one of whom was over 60 years of age | 192 units |
| Vacant | 2 units |
| Total | 202 units |

"      .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"10. On the first Monday in March, 1964, the 141 single family houses in Palmdale were used as follows:

| | |
|---|---|
| Leased to persons under 60 years of age | 85 houses |
| Leased to persons or couples one of whom was over 60 years of age | 49 houses |
| Vacant | 7 houses |
| Total | 141 houses |

"      .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"As rapidly as qualified senior residents could be found for the Palmdale houses, plaintiff leased those houses to such persons. Since that process could be completed only over a period of time, plaintiff found it necessary to rent unoccupied houses to younger, unqualified persons on a temporary month-to-month basis to prevent deterioration and vandalism and to obtain revenue.

"11. The two parcels of property directly involved in this case were on the first Monday in March, 1964 used as follows:

*Lot 36 in Lancaster*: The single story, two-unit building located thereon was leased to persons over 60 years of age at a rental of $55.00 per month per unit. (First Cause of Action)

*Lot 1 in Palmdale*: The single family house located thereon was leased to individuals under 60 years of age at a rental of $65.00 per month. (Second Cause of Action)

"12. In leasing the property, plaintiff had no restrictions as to race or religion, but did inquire as to the health and personality of a prospective tenant, as well as his financial ability to pay the monthly rentals. No mini-

mum or maximum financial standing was required. Except as noted below, plaintiff did not sponsor, aid with cash payments, reimburse or otherwise help any of the tenants pay their monthly rentals, nor did it have a program for lower or reduced rentals to recognize any inability to pay. On occasion, however, several tenants were permitted to perform odd jobs around the premises, such as cutting lawns, etc., in exchange for partial or full waiver of a monthly rental payment.

"13. Plaintiff did not offer its residents, either those over 60 years of age or those under that age, a life care or life care program. Plaintiff did not furnish medical, hospital, surgical, nursing or dental care to its residents, nor did it furnish any meals, dining, dietary or food services. There were no medical, hospital, infirmary or clinic facilities on the premises, nor was there any regular food services, dining or dietary facilities.

"14. The tenants of the property provided furnishings for their own apartments or houses, owned the furniture and furnishings placed therein, provided for their own meals, cleaned and maintained or provided for the cleaning and maintenance of their leased apartments or homes. The tenants provided their own laundry services and paid for their own telephone, gas, electric and, at times, water services. The tenants were in essence totally self-sufficient and self-supporting. Each tenant was responsible for his own person, his apartment or his house and led a completely independent life.

"15. One of the duplexes at the Lancaster apartment complex and the former church building at the Palmdale location were converted by plaintiff into community centers, at which recreational, social, religious and cultural activities were conducted. Plaintiff engaged a deaconess from the Lutheran church to act as a full-time program director for these activities. The program included social activities such as teas, coffee clatches and potlucks, games, lectures, travelogues, excursions to places of interest, a library and handicrafts. Lutheran church services were provided on Sunday and bible classes at other times. Transportation was arranged as requested for residents attending other churches and for shopping. Small discounts were made available through local merchants. Counseling was provided for those in bereavement. No medical or hospital services were provided directly by plaintiff, but plaintiff did arrange with local physicians to provide medical services in emergencies. The cost of these services were generally borne by the tenant-patient and were occasionally waived. The Lutheran Hospital at Pacoima (no connection or association with plaintiff) was available, on an elective basis, for those needing hospitalization. The cost of such care was generally borne by the tenant-patient, although in one case the hospital provided free care to the patient. The community centers were available for use and were used by various organizations located in the

surrounding community. Both the converted duplex at Lancaster and the former church building at Palmdale were granted property tax exemptions by defendant in 1964.

"16. Most of the residents of the properties who were over 60 years of age or were disabled lived on social security benefits or other similar pensions. In cases of financial distress, payment of rent to plaintiff was deferred for short periods of time, but none of the residents was ever evicted.

". . . . . . . . . . . . . . . . . ."

"19. At Lancaster, plaintiff's rental schedule for all units was between $15.00 and $20.00 per unit less than the reasonable, though depressed, market rental value, which sum approximates county taxes prorated monthly. At Palmdale, plaintiff's rental schedule for the single family homes was comparable with similar taxable rental homes in the area. In the operation of the rental units and single family homes, there is no evidence of any financial support from the Lutheran church or of any substantial gifts, donations or contributions from other sources."

The record shows plaintiff did not equip the houses and apartments with any of the special features sometimes placed in housing especially built for the aged.

California has recognized that to provide the special care and attention required by aged persons may be a charitable activity, even though the persons served are able to make and do make substantial payment for the services rendered. (See *Fredericka Home* v. *County of San Diego* (1950) 35 Cal.2d 789 [221 P.2d 68]; *Fifield Manor* v. *County of Los Angeles* (1961) 188 Cal.App.2d 1 [10 Cal.Rptr. 242].) In the *Fredericka* case the court said at pages 792-793: "The concept of charity is not confined to the relief of the needy and destitute, for 'aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants.' . . . In short, as the word 'charity' is commonly understood in modern usage, it does not refer only to aid to the poor and destitute and exclude all humanitarian activities, though rendered at cost or less, which are maintained to care for the physical and mental well-being of the recipients, and which make it less likely that such recipients will become burdens on society."

The Fredericka Home had received as gifts land and buildings and a $200,000 endowment. Applicants were admitted under life care contracts, whereby each paid an admission fee, the exact amount of which depended upon life expectancy and the applicant's choice of accommodations. About 65 percent of the operating expense was met by admission fees and the

other 35 percent was covered by the endowment and gifts from other persons. In explaining why Fredericka Home was a charitable institution the court said at pages 794-795: "There can be no doubt that arrangements for such life care contracts fill a social purpose as well as a need of the applicants for admission. Approaching those years when the physical and mental faculties normally decline over an indefinite period of time and being faced with the prospect of expending increased but indeterminable amounts for care during that period, the applicants, by means of such life care contracts, avoid the need of living in penury occasioned by the haunting fear that they will exhaust their meagre resources and become public charges."

In *Fifield Manor, supra,* the record also showed a home providing life care contracts. The applicant's payment "was designedly fixed at a sum less than actual cost. . . . No worthy person was to be denied or was in fact denied admission because of inability to make payment of all or part of an admission fee; the entrance fees of such persons were raised by seeking donations from members and friends of the First Congregational Church and of the Fifield Homes; in some instances entrance fees were waived." (188 Cal.App.2d 1, 5.)

The court there held that the home served a charitable purpose even though some of the residents might be considered wealthy.

■ Nothing in those cases supports tax exemption for plaintiff here. Nor has plaintiff cited any precedent anywhere for treating any activity comparable to plaintiff's as charitable. Under the plan of operation established by plaintiff it was necessary for the tenants to pay the full cost of the housing provided. Plaintiff had no other resources. If the plan was to succeed the rents had to pay the cost of operation and amortize the purchase price of the land and buildings. As the trial court found, the rents charged were the market price except that in the Lancaster apartments plaintiff passed on to the tenants the hoped-for saving in property taxes.

The fact that some tenants were on some occasions allowed to pay their rents by performing labor is not charity. The fact that tenants were not promptly evicted when they defaulted shows only that plaintiff was not as strict and harsh as some landlords might have been. There was no plan for remitting the rents of those in financial distress and no agreement to do so. On the contrary the contemplation was that rents would be paid in accordance with the terms of the leases. Plaintiff provided no security against the elderly person's hazard of outliving his resources.

■ Plaintiff contends that the services it afforded the elderly, in addition to housing, entitled it to be treated as charitable, within the meaning of the *Fifield* case.

The only services which the trial court found were furnished by plaintiff itself were the recreational, social, religious and cultural activities conducted at and through the community centers which were under the direction of a Lutheran deaconess. These centers were for the benefit of the community as a whole. Plaintiff applied for and received tax exemption for the community centers upon the representation that each was a "meeting place for Senior Citizens in the entire Antelope Valley Area." The fact that plaintiff provided this kind of community service nearby did not make its business of renting homes charitable.

Plaintiff did arrange with local physicians to provide medical services in emergencies, and for a hospital in Pacoima (approximately 50 miles away) to make itself available. These services were provided at the expense of the tenant and, so far as the record shows, were no different from the services the physicians and hospital were prepared to furnish to other groups of persons. If the physician made any reduction in his charges, that was his own charitable act.

The trial court found "Small discounts were made available through local merchants," but there is no showing that this was other than an effort by the merchants to stimulate trade. There is no evidence that plaintiff made any substantial contribution of services or otherwise to obtain this benefit for its tenants.

When plaintiff's operation is viewed as a whole, the service it actually rendered was to assemble a congenial group of persons over 60 years of age in an area where low-rental housing was available, in the vicinity of a Lutheran community center. This service, and the activities incidental to it, could just as well have been offered to adults of any age group, or to persons of all ages. This is not what is meant in the cases which talk about the charitable purpose of providing the services especially required by the elderly.

The trial court's memorandum of decision expressed the view that the 1968 amendment to Revenue and Taxation Code section 214,[2] and the legislative declaration in the bill which made the amendment,[3] indicated

---

[2]The new language added in 1968 is as follows: "Property used exclusively for housing and related facilities for elderly or handicapped families and financed by the federal government pursuant to Section 202 of Public Law 86-372 (12 U.S.C. 1701q), as amended, and owned and operated by religious, hospital, scientific or charitable funds, foundations or corporations meeting all of the requirements of this section shall be deemed to be within the exemption provided for in Section 1c of Article XIII of the Constitution of the State of California and this section."

[3]Stats. 1968, ch. 645, § 4: "The Legislature finds and declares that there has been some misconception concerning the scope of the welfare exemption from property taxation among tax officials. The overwhelming majority of assessors and the State

a public policy to exempt from property taxation all nonprofit corporations which provided low-cost rentals for elderly and handicapped families. The new language in section 214 declared that property financed under title 12, United States Code section 1701q, should be deemed within the charitable exemption. Section 1701q authorizes long-term low-interest federal loans of 90 or 100 percent of the cost of development of rental housing for elderly and handicapped families. That statute makes it possible to develop housing which might not be built at all with private financing, and which is subsidized by the federal treasury to the extent that the loan terms are more generous than the cost of private financing. That saving of cost can be passed along to the tenants in the form of lower rents. Plaintiff received no such federal subsidy, and had no such saving to pass along to its tenants, who were expected to pay rent sufficient to cover the full market cost of purchasing and operating the rental units.

The 1968 amendment to Revenue and Taxation Code section 214 did not say that all low-rental housing provided by nonprofit corporations for the elderly should be tax exempt. The amendment referred specifically to housing built under section 1701q of title 12 of the United States Code. It carried no implication of the kind assumed by the trial court.

The judgment is reversed with instructions to enter judgment for defendant.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied November 12, 1970, and respondent's petition for a hearing by the Supreme Court was denied December 17, 1970.

---

Board of Equalization have ruled that property financed by the federal government pursuant to Section 1701q of Title 12 of the United States Code, which is owned and operated by nonprofit corporations to provide housing and related facilities for elderly or handicapped families, comes within the welfare exemption from property taxation. However, some assessors have not so determined, and this has caused inequality in that this property is assessed in some parts of the state and not in others.

"If obligated to pay taxes on this property, the purpose for which these nonprofit corporations have been established—to provide low-cost rentals to elderly and handicapped families—will be defeated, as the amount of tax added to the rent payments will make such rental units too expensive for the families which need them most. This act will remedy the situation by, in effect, making clear that the Legislature intends that the welfare exemption from property taxation shall apply to such property. In so doing, the public policy of the state as expressed in Section 1c of Article XIII of the Constitution will be fulfilled and the state as a whole will benefit."