487 P.2d 1272

**FRIENDSHIP MANOR CORPORATION, a Utah nonprofit and charitable corporation, Plaintiff and Respondent,**

v.

**The TAX COMMISSION of the State of Utah, et al., Defendants and Appellants.**

**No. 12145.**

Supreme Court of Utah.

Aug. 9, 1971.

---

1. 102 Utah 548, 562, 133 P.2d 325, 331, (1943).

Vernon B. Romney, Atty. Gen., Louis S. Callister, Sr., Sp. Asst. Atty. Gen., Bill Thomas Peters, Asst. Atty. Gen., Salt Lake City, for defendants-appellants.

Roe, Jones, Fowler, Jerman & Dart, Bryce E. Roe, Justin C. Stewart, Salt Lake City, for plaintiff-respondent.

Barker, Ryberg & McCoy, John L. McCoy, Salt Lake City, for amicus curiae.

HYDE, District Judge.

This action was filed by the plaintiff in Third District Court to have the court declare:

(1) that plaintiff's lot and building located at 1320 East 5th South, Salt Lake City, Utah, known as Friendship Manor, are being used exclusively for charitable purposes within the meaning of Article XIII, Section 2, Utah Constitution, and 59–2–1, U.C.A.1953, so as to be exempt from the ad valorem (general property) tax;

(2) that the Utah State Tax Commission has no power under the Utah Constitution or statute to overrule a county determination that property is tax exempt or to direct the county how to rule in the future; and

(3) that if such power exists the Tax Commission did not proceed in a legal and constitutional manner.

The trial court ruled:

(A) that the Tax Commission did not exceed its authority in ordering the Salt Lake County Assessor to place Friendship Manor on the tax rolls;

(B) that the Manor was used exclusively for charitable purposes and was exempt from the ad valorem tax;

(C) those apartments occupied solely by tenants who are under 62 years of age, who are not handicapped and who are not employed by plaintiff to assist in

management or operation of Friendship Manor, are subject to separate assessment;

(D) that said defendants tax the plaintiff's property for 1968 and 1969 and subsequent years by assessing only those apartments that are occupied solely by persons who are under 62 years of age, not handicapped, and not employed by plaintiff to assist in the management or operation of Friendship Manor, as of January 1, of each tax year.

Defendant appellants seek modification of the judgment to provide that the said Friendship Manor is not being used in any portion exclusively for charitable purposes as that term is defined in Article XIII, Section 2, of the Constitution of Utah and Section 59-2-1, U.C.A.1953, and that the Assessor of Salt Lake County be directed to enter the same on the tax rolls of Salt Lake County and that the same be taxed for the years 1968, 1969 and subsequent years without any exceptions. Plaintiff seeks affirmance of the judgment insofar as it determines that plaintiff's property is being used exclusively for charitable purposes, but modification of the judgment to provide that taxes may not be assessed against any portion of plaintiff's property for the years 1968 and 1969.

Plaintiff was organized as a Utah nonprofit corporation in March, 1963. The organization of plaintiff and construction of a housing project for elderly persons was sponsored by four religious organizations: The First Unitarian Church of Salt Lake City; The First Congregational Church of Salt Lake City; The Temple B'nai Israel of Salt Lake City; and The United Church of Christ, a Utah association. Plaintiff's corporate purposes are to provide senior citizens and handicapped persons with housing facilities and services designed to meet their physical, social, psychological and charitable needs and to promote their health, security, happiness and usefulness in longer living. Plaintiff has been determined to be a charitable organization exempt from federal taxation under Section 501(c) (3) of the Internal Revenue Code.

The site acquisition and the construction of Friendship Manor as a housing facility for elderly persons was financed under the provisions of Section 231 of the National Housing Act. Plaintiff executed a promissory note in the amount of $3,317,600, secured by a mortgage on the Friendship Manor property. The note is insured by the FHA and is payable over a period of 40 years at $5\frac{1}{4}$ per cent interest and $\frac{1}{2}$ per cent FHA insurance charge.

Under Federal Housing Administration provisions it was necessary to have set up as capital outlay $25,000 as money contributed by the sponsors in order to obtain the loan. Plaintiff borrowed this $25,000 from Chuckrow Construction Company (the construction company that built the apart-

ment house) to assist in commencing operation of Friendship Manor. This debt is evidenced by a promissory note and is payable after the mortgage is discharged. The FHA regulation is a special financing for the construction of apartments of this nature. The regulations of the FHA permit occupancy of as much as 20 per cent of the units by persons who are not elderly or handicapped.

The building is of special design and construction for the safety and convenience of elderly persons. It is not necessary for tenants to climb stairs in order to enter the building, and there are elevators to all floors which have been adjusted to accommodate slower ingress and egress, and all floors are carpeted.

Grab rails have been installed in all of the bathrooms. There is an alarm in each room which permits tenants to contact the desk should an emergency occur any time during the day or night. The Manor includes a dining room, library and reading room, beauty shop, lounge and recreation areas. Programs of a cultural or social nature such as music, art and lectures are scheduled at least once a week. There are groups which meet at the Manor, and the tenants often play cards, bingo, or the like. In order to ensure that the tenants obtain nutrition and to encourage them to mix periodically with the others the Manor requires that each tenant take at least one meal per day in the dining room.

There are 228 units in the Manor, including 77 studio apartments (single rooms with bath and closet, with no kitchen), 88 efficiency apartments (like the studio apartments, but with kitchens), 39 single bedroom apartments, 11 two-bedroom apartments, and five single bedrooms, and three two-bedroom apartments on the top floor. In renting the apartments plaintiff makes an extra charge for balconies present on some of the apartments, and adds $1.00 per floor above the second to the monthly rent. All amounts received from the rental of the apartments are used for maintenance, operation and payment on the mortgage.

Tenants who occupy the Friendship Manor must meet certain requirements. The tenants must be ambulatory; they must be financially able to maintain or pay the rent, as well as take care of themselves. The Friendship Manor does not accept tenants if they are not financially responsible to pay the expenses and maintain the standard of living which is required by the Friendship Manor. The tenants must be of the age of 62 years or over. (Under FHA regulations 20 per cent of the total number of apartments may be rented to people who are under 62).

The applicant upon being accepted for tenancy is required to pay the first and last months' rent in advance. Further, the tenant is required to put up the cost of

one meal over a 30-day calendar month in advance. If he were going to eat just breakfast it would be $20 a month; lunch would be $27 a month, and dinner would be $35 a month.

Friendship Manor rented space in the buildings for a beauty shop to a private individual at $150 per month; a sundry shop was rented to an individual at $75 per month, and an office was rented to a doctor for $100 per month. The amount of rent for the apartments is set so that the total amount collected meets all expenses, amortization of interest and principal. If for any reason there was an increase in the cost of operation, such as taxes, that would have to be met by increasing the rentals.

On March 25, 1964, the Salt Lake County Attorney advised the County Assessor that under the proposed use plaintiff was eligible for an exemption in that its property would be used exclusively for charitable purposes. As a result the County Assessor notified the FHA by letter that Friendship Manor would be eligible for exemption from ad valorem tax after commencement of construction. The 1967 taxes on the Manor were abated, and in 1968 exemption was again considered by the Salt Lake County Commission. In December, 1968 the then County Attorney issued an opinon that the Friendship Manor should be placed on the tax exempt rolls and all taxes shown thereon as unpaid should be abated. The County Commission on December 4, 1968 did abate the taxes and directed that the property be placed on the tax exempt rolls. Thereafter, on January 2, 1969 the State Tax Commission issued a "directive order" stating that Friendship Manor was not on the assessment rolls, and the Commission authorized and directed the County Assessor and the County Board of Equalization to enter the assessment of Friendship Manor on the assessment rolls for the year 1968 and such future years until such times as the Utah State Tax Commission or some court of competent jurisdiction directs otherwise. Plaintiff contends that it was entitled to a notice and hearing and that failure to give notice and hold a hearing was in violation of the due process clause of the Fourteenth Amendment to the Federal Constitution.

Among other provisions the State Tax Commission has the power and duty:

(1) to have and exercise general supervision over the administration of the tax laws of the state and over assessors and county boards and other county offices in the performance of their duties in connection with assessment of property; [1]

(2) to examine carefully into all cases where evasion or violation of the

1. 59-5-46(9), U.C.A.1953.

laws of assessment and taxation of property is alleged, complained of or discovered, and to ascertain wherein existing laws are defective or are improperly or negligently administered;[2]

(3) to make annual investigation throughout each county to determine whether all property subject to taxation is on the assessment rolls, and to direct county officials to enter the assessment of any property subject to taxation which is not assessed.[3]

The statutory requirement of such notice and hearing applies when the State Tax Commission intends to itself make an assessment. This was not done in this case, but instead acted pursuant to the provisions of 59–7–13, U.C.A.1953, and directed the appropriate county officials to enter the assessment of such "escaped" property.

Under such statutory powers and duties the Tax Commission can direct county officials to assess property as taxable property even though the officials of the county have concluded it was property exempt from taxation under the Constitution and can do so in the manner done herein. The trial court was correct in so ruling. The Tax Commission cannot, however, make taxable property that is exempt under the Constitution.

The Utah Constitution (Article XIII, Section 2) and 59–2–1, U.C.A.1953, specifically exempts property from taxation that is "used exclusively for either religious worship or charitable purposes." (It should be noted that the statute is basically a rephrasing of the constitutional provision, but the Legislature has not defined what constitutes "charitable purposes.") To be exempt, therefore, the property must (1) be used for charitable purposes, and (2) it must be exclusively so used.

Plaintiff argues that the nature of the corporate ownership being nonprofit, together with the stated purpose for which plaintiff was incorporated, together with it being determined to be a charitable organization exempt from federal taxation, together with the special type of construction and services provided for senior citizens, together with the requirement that the tenant be a senior citizen, make its use exclusively for charitable purposes. (A senior citizen being defined as an individual over the age of 62.)

Defendants' contention is basically that it cannot be a property used exclusively for charitable purposes when the tenants are paying for all of the facilities and services they receive and that about the only charity involved is that the tenants pay less rent because the property is not taxed.

2. 59–5–46(19), U.C.A.1953.

3. 59–7–13, U.C.A.1953.

**234**

■■ It is the use to which it puts its real property which is the determination of whether or not such property is exempt. If the charitable organization does not use its real property and building thereon exclusively for charitable purposes such property is not exempt, notwithstanding the fact that the owner thereof is a charitable organization. The fact that plaintiff is exempt from federal taxation under the provisions of the Internal Revenue Code, is not determinative, although the nonprofit aspect would be a necessary ingredient of a qualifying charitable operation.

In Parker v. Quinn, 23 Utah 332, 64 P. 961 (1901), the court stated the principles that apply to taxation and exemption as follows:

* * * The general rule is that all property of what kind soever, and by whomsoever owned is subject to taxation; and, when any kind of property is exempt it constitutes an exception to this rule. The reason of the rule is that it is just and equitable that every species of property within the state should bear its equal proportion of the burdens of the government. When, therefore, an owner claims that certain property is exempt from taxation, the burden is upon him to show that it falls within the exception. And an exemption will not be aided by judicial interpretation. It must be shown to exist by express terms of the enactment which it is claimed grants it. "The presumption is that all exemptions intended to be granted were granted in express terms. In such cases the rule of strict construction applies, and, in order to relieve any species of property from its due and just proportion of the burdens of the government, the language relied on as creating the exemption should be so clear as not to admit of reasonable controversy about its meaning; for all doubts must be resolved against the exemption. The power to tax rests upon necessity, and is essential to the existence of the state."

* * * Any property falling within the exception is released from this burden, and such release is justified on the theory that the state derives some peculiar benefit—whatever that may be —from such property. * * *

The court thereupon exempts the portion of the building which was owned and managed by the "Relief Society," stating:

* * * It ministers to the poor, sick, and destitute of the community. Its purposes are excellent, and the means adopted commendable; and, no doubt, the state is measurably benefited by having its poor and helpless subjects under the benign protection and care of such a society. * * *

And the court further ordered the portion of the building held as a source of revenue to be taxed.

In the case of Salt Lake Lodge No. 85, B. P. O. E. v. Groesbeck, 40 Utah 1, 120 P. 192 (1911), where the question presented was whether or not property came within the provisions of the Constitution and statute exempting property exclusively used for charitable purposes from taxation, the court stated:

The general rule is that when private property is claimed to be exempt from taxation the law under which the exemption is claimed will be strictly construed. * * * There is, however, an exception to this general rule, and statutes exempting property used for educational and charitable purposes or for public worship, under the great weight of authority, should receive a broad and more liberal construction than those exempting property used with a view to gain or profit only. *The reason for the rule is that the state, by exempting property used exclusively for one or more of the purposes mentioned from taxation, is presumed to receive benefits from the property equivalent at least to the public revenue that would otherwise be derived from it.* And manifestly the purpose of the statute in exempting property used exclusively for charitable purposes is to encourage the promotion of institutions and organizations having for their object the care and maintenance of the indigent and destitute citizen, the helpless orphan and the poor who are sick and afflicted, and whose charity and ministrations in these respects correspondingly relieve the state of such burdens. [Emphasis added.]

In the case of Mountain View Homes, Inc. v. State Tax Commission, 77 N.M. 649, 427 P.2d 13, the Supreme Court of New Mexico had before it a question of the exemption of a multi-family housing complex in Albuquerque containing 316 units ranging in size from efficiency apartments to three bedrooms with two baths renting for $105 per month. The project was financed and administered under the National Housing Act, as amended. The maximum income for tenants occupying the dwelling was regulated and controlled under the provisions of the National Housing Act. The sponsor of the multi-housing complex was a nonprofit corporation organized under the laws of New Mexico to provide dwelling accommodations for moderate and low income families and for families displaced by urban renewal areas. Its articles of incorporation prohibited distribution of any of its earnings to the benefit of any stockholder, individual member or officer of the corporation.

The New Mexico Supreme Court stated:
* * * True, no one makes a pecuniary profit, and certain persons and families who may be described as "low-income, workers," "aged," or "underprivileged" are provided better housing

at lower prices than would otherwise be available to them. A benefit is thus bestowed. However, the recipients are certainly in no sense sick or indigent, and we would venture that most would be surprised to learn they are considered as being proper objects for, or as recipients of charity. * * * It is clear that rents are fixed at an amount necessary to pay the interest, amortize the principal and pay all expenses of maintaining the property. By what theory this should not include taxes on the same basis as other comparable properties is not clear to us. That the federal government does not tax income derived from the property is in no way persuasive. Here, we have an enterprise to furnish low-cost housing to a certain segment of our population. It was intended to be self-supporting, without any thought that gifts or charity were involved. The tenants are required to pay for the premises occupied by them with the rentals being fixed so as to return the amount estimated as being necessary to pay out the project. It is competitive with landlords offering other residential property for rent and on which taxes must be paid. Also, as the State Tax Commission found, there was no evidence that the public is relieved of any expense in comparison with the loss of tax revenue. Compare Berger v. University of New Mexico, 28 N.M. 666,

217 P. 245 (1923). We conclude the use is not charitable so as to exempt the property from taxes under Article VIII, Sec. 3, N.M.Const.

Article VIII, Section 3, of the New Mexico Constitution provides for exemptions from taxation all property used for "educational or charitable purposes." It did not include "exclusively for charitable purposes" as the term is incorporated in the Constitution of Utah.

Colorado considered the question of charitable exemption in the case of United Presbyterian Association v. Board of County Commissioners, 167 Colo. 485, 448 P.2d 967 (1968). This case is factually similar to our case. The sole question presented for review was whether or not Highland West owned and operated by a nonprofit association as a home for physically independent elderly persons who pay for their tenancy is entitled to tax exemption. The plaintiff, the United Presbyterian Association was incorporated as a nonprofit corporation. Its formation was sponsored by three Denver area churches, each of which designated three trustees to constitute the Board of the association. The association's articles of incorporation declared the following corporate purposes:

To provide elderly persons on a nonprofit basis, with housing facilities and services, specially designed to meet the physical, social and psychological needs

of the aged, and contribute to their health, security, happiness and usefulness in longer living.

Its bylaws provided for the disposition of the association's assets upon dissolution and prescribed that the remaining net assets shall be set over to the three sponsoring churches to be used as they may direct in furtherance of the "charitable educational and benevolent purposes of this corporation."

The association built Highland West, a twelve-story apartment house containing 121 units, ranging in size from buffet apartments to two-bedroom apartments. The building has special construction features designed for the elderly: ramps in lieu of steps, wide doors to accommodate wheel chairs, grab bars at strategist locations, an electronic alarm system connecting each apartment with the resident manager's office, and elevators of the size to admit stretchers. The building also had a lounge, recreation room and enclosed roof deck for common use by the tenants, as well as two kitchens for group use. The building was financed by funds received from a loan in the sum of $1,554,790, insured by the Federal Housing Administration under Section 231 of the National Housing Act. The home was operated by the association. The trustees received no compensation, but a realty firm was employed to manage the property. The resident manager and the assistant manager were also employed.

Persons desiring to reside in Highland West were required to submit a written application, together with a $100 fee to the Admissions Committee of the association. Application must contain information as to the personal history, financial status and health of the applicant. The Admissions Committee screened all applicants as to standards prescribed by the association's bylaws, and admissions to residents is contingent upon the committee's approval.

Although partially handicapped persons would be admitted they must be fully self-sustaining physically, because Highland West was not a nursing home. There was nothing in the association's articles of incorporation, bylaws, or in its agreement with the tenant, which imposed any obligation upon the association with respect to a resident who loses either his financial or physical independence.

The Colorado court enunciated the doctrine that the established rule is that the presumption is against tax exemption, and the burden is on the one claiming the exemption to establish clearly his rights thereto. The court felt that the special facilities and services differed only in type, but not in nature, from those provided by commercial multi-residential buildings. They stated the corporation's nonprofit status cannot be equated with charitableness, but is one factor which merits consideration in the determination of whether property is being used for strictly charitable purposes. The court felt the amount

and nature of the fees and rentals which plaintiff required the elderly tenants to pay negated a charitable purpose, as did the fact that nothing imposed an obligation upon the association to care for persons if they became ill or without financial resources. The court further felt that Highland West was not performing what would otherwise be a governmental function, stating:

> The justification for charitable tax exemption, especially insofar as the rights of the body politic are involved, is that if the charitable work were not being done by a private party, it would have to be undertaken at public expense.

And further:

> Although care for the aged is a proper concern of government, governmental obligation does not extend to the care of physically and financially independent elderly persons who alone can qualify for admission to Highland West. * * * The furnishing of homes to older adults is not in itself a charitable purpose.

The Colorado court in holding that the operation known as Highland West was not to be tax-exempt stated:

> "Where material reciprocity between alleged recipients and their alleged donor exists—then charity does not.

In 1968 the Texas court [4] analyzed cases where similar activities have been recognized as qualifying for tax exemption in the jurisdiction of California, Minnesota and Kansas and cases from Ohio, Nebraska, Oregon and Florida where such exemptions have been disallowed. The Texas court stated (426 S.W.2d 947):

> It is apparent from a careful review of these decisions that they are not of controlling persuasion in determining the problems of exemptions with us. The cases in other jurisdictions present substantial variations in the organization and manner of operation of the institutions under review. The governing provisions of the Constitution and statutes of these states vary in their requirement for tax exemption, particularly as construed by their courts and in the tests established for exemption. The decisions recognizing tax exemption are rested principally upon the conclusion that people in later years have special care and residential requirements, the alleviation of which is of social value; and that exemption should be allowed where such needs are being met by institutions not organized or operated for private profit. The decisions denying exemptions have emphasized that the occupants of the home were the principal beneficiaries rather than society in general and that society was not relieved of responsibility for persons in need. All

---

4. Hilltop Village, Inc. v. Kerrville Independent School District, 426 S.W.2d 943.

of the courts appeared to pay homage to the rule that tax exemptions are subject to strict construction since they are the antithesis of equality and uniformity.

In answer to the question "What is the difference between Friendship Manor and the Newhouse Hotel?" (Newhouse is a similar operation in Salt Lake City, commercially operated and taxed.) Plaintiff's response is "profit."

In 1931 this court ruled [5] that in order to fall under the constitutional exemption the nonprofit character of the property is a necessity. That the purposes for which a hospital was organized and permissible under its articles of incorporation was the test rather than whether or not it in fact made a profit. This cannot be construed, however, to mean that an organization being incorporated as a nonprofit corporation makes the constitutional exemption automatically available to it. In this same case the court stated:

> A charity is a gift to the *general public use* which extends to the rich as well as to the poor. The test of a charity and the test of a charitable organization are in law the same. (Emphasis added.)

The general rule is then that all property is taxed unless exempt, and to be exempt the burden is upon the property owner to show it falls within the exemption.

The power to tax rests upon necessity and is essential to the existence of the state, and in order to be exempt the state must be benefited in some regard so as to relieve the state of some burden.

The nonprofit character of the corporation is essential but not determinative.

While the care of the aged may well be a state function age alone does not make one a subject of charity.

Where the senior citizen is paying for all of the services he receives and the rental of the apartments is not determined by need, but is determined by what is required to retire the principal and interest of the mortgage, together with all upkeep and operation expenses, no charitable purpose is involved. The state does not have the obligation to provide living accommodations to persons well able and willing to pay for their needs.

This case is remanded to the district court with directions to enter judgment in accordance with this decision. No costs awarded.

TUCKETT, HENRIOD, ELLETT and CROCKETT, JJ., concur.

CALLISTER, C. J., having disqualified himself, does not participate herein.

5. William Budge Memorial Hospital v. Maughan, 79 Utah 516, 3 P.2d 258.