No. 46,502

Lutheran Home, Inc., a Corporation, *Plaintiff-Appellee*, v. Board of County Commissioners of Dickinson County, Kansas: Dr. L. G. Heins, Elmer S. Anderson, Elmer Jones, as Commissioners Thereof; Marie A. Sullivan, County Clerk of Dickinson County, Kansas: Marie A. Sullivan, County Assessor of Dickinson County, Kansas: and Vivian L. Gormley N/B/M Vivian L. Detrick, Treasurer of Dickinson County: Ronald S. Dwyer, as Director of Property Valuation of the State of Kansas, *Defendants-Appellants*.

(505 P. 2d 1118)

Opinion filed February 5, 1973.

*Max M. Hinkle*, of Abilene, argued the cause, and *William L. Winkley*, of Abilene, was with him on the brief for the appellants.

*John F. Christner*, of Abilene, argued the cause, and *W. H. Alward*, of Herington, was with him on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by Lutheran Home, Inc. pursuant to K. S. A. 79-2005 to recover ad valorem real property taxes paid under protest. The basis of the claim is that plaintiff's property is used exclusively for charitable and benevolent purposes and therefore is exempt from taxation. Plaintiff's property consists of a tract of land on which is situated a nursing home owned and operated by the plaintiff corporation. The defendants are the board of county commissioners of Dickinson County, other county officials and the director of property valuation of the State of Kansas. In addition to the recovery of taxes plaintiff sought a judgment of the district court determining that the property in question is used exclusively for charitable and benevolent purposes and directing that the property be removed from the tax rolls of Dickinson County and that no future assessments or levies be made or taxes collected on the property as long as the property is used for such purpose. The district court granted judgment in favor of the plaintiff, holding that the plaintiff was entitled to the exemption claimed. The defendants have appealed to this court.

The facts in this case are not in dispute. Lutheran Home is a nonprofit corporation, organized and chartered under the laws of Kansas. Although its name may indicate otherwise, Lutheran Home is not affiliated with nor supported nor regulated by any religious body. The corporation was formed in January 1967 by Ervin E. Biehler, his wife Lillian, and Fred M. Thompson, who were the three incorporators.

In 1964 when the nursing home opened it was owned and operated by another corporation, Lutheran United Home for the Aged, Inc. The construction of the nursing home was made possible through the issuance of first mortgage bonds in an amount in excess of $300,000. These bonds were sold to interested persons and banks in the community, who with Mr. Biehler and Mr. Thompson provided the necessary financing to construct the nursing facility. The operators of the nursing home found difficulty in meeting their financial obligations. The predecessor corporation Lutheran United Home for the Aged, Inc. became insolvent. Mr. Biehler and Mr. Thompson were holders of about $45,000 in bonds of the predecessor corporation; they were also the holders of notes of that corporation in excess of $42,000. In order to keep the nursing home

open and to protect the holders of the bonds Mr. Biehler and Mr. Thompson took steps to reorganize the operation. Mr. Biehler entered into a contract with Lutheran United Home for the Aged, Inc. whereby Mr. Biehler agreed to receive and take title to all of the property of the nursing home in consideration for which he assumed and agreed to pay all of the obligations of the predecessor corporation. Mr. and Mrs. Biehler and Mr. Thompson then proceeded to incorporate the plaintiff Lutheran Home, Inc. as a nonprofit, nonstock corporation. Lutheran Home, Inc. immediately entered into a contract with Mr. Biehler under the terms of which Mr. Biehler conveyed to Lutheran Home, Inc. all of the real estate and personal property in consideration of which Lutheran Home, Inc. assumed and agreed to pay all of the outstanding obligations of the predecessor corporation which had been assumed by Mr. Biehler. There was no other consideration for the agreement. The stated purpose of the new corporation Lutheran Home, Inc. was principally to own, lease, operate, maintain and administer nursing homes on a nonsectarian basis and to provide elderly persons on a nonprofit basis with housing facilities and services specially designed to meet the physical, social and psychological needs of the aged, and contribute to their health, security, happiness and usefulness in longer living. The articles of incorporation provide that the incorporators shall constitute the Board of Trustees who are vested with complete control of the corporation's affairs. The articles further provide that the trustees shall serve for life or until their death, resignation or removal from the community. Successor trustees are to be appointed from the community either by the remaining trustees or in the event of their inability to act, by the senior judges of the district court of Dickinson County.

At the trial of the case in March of 1971 Mr. Biehler held $40,000 of the original first mortgage bonds and Mr. Thompson owned bonds in the amount of approximately $5,000. In addition to being a bondholder Mr. Thompson held a second mortgage on the nursing home property which secured a loan by Mr. Thompson to the corporation in the sum of $30,000. In the period from January 1, 1967, to June 30, 1970, Lutheran Home, Inc. repaid Mr. Thompson $20,000 on this loan with interest at 6%. Lutheran Home, Inc. owed Mr. Biehler in addition to the bond obligation the sum of $12,529 on a loan which the corporation contracted when it purchased the nursing home from Mr. Biehler. Between 1967 and

1970 the corporation made payments with interest to Mr. Biehler so that this loan was reduced to $10,000.

The articles of incorporation of Lutheran Home, Inc. provide that on dissolution of the corporation after the payment of all bills and accounts the remainder of the property shall be converted to cash which shall be paid over to such charitable and educational organizations as shall be designated by a vote of the trustees. The articles provide that they may be amended by a ⅔ vote of the trustees at any annual or special meeting. The articles further provide for the adoption of bylaws by the trustees who may change them at their pleasure so long as they do not conflict with the articles. Article XII declares that no part of the net earnings of this corporation shall inure to the benefit of any private individual. Article XII of the corporation bylaws provides as follows:

"It is the intent and purpose of this corporation and its Trustees that all services rendered and functions performed by the corporation except those rendered and performed for the United States or for any of its agencies, shall, at all times be handled on a cost of doing basis and without income or profit to the corporation or to its members as such, in order that any and all amounts received by the corporation from or in connection with, such services or functions, over and above the cost thereof to the corporation, shall at all times, belong to and be the exclusive property of the corporation."

Since the nursing home opened in 1964, Frances B. Kandt has been the only manager. The facility is similar to most nursing homes in its services and operations. It is classified by the State of Kansas as a skilled nursing home and is qualified to receive recipients of welfare. There are no eligibility requirements for residents except that a physician must give a care referral to the corporation. The nursing home operates on a nonsectarian basis. Regular weekly religious services are conducted in a small chapel by visiting clergymen of all faiths. The facility accommodates 49 residents of whom the average age is about 80 years. About half of the residents are bed patients and the other half are able to dress and attend meals in the dining room.

During 1969 and 1970 the corporation charged a monthly rate of $230 for each ambulatory resident; nonambulatory residents were assessed an additional $30 per month. At the time of the trial in March 1971 there had been an increase in the monthly rate to $260 per month for ambulatory residents and $290 per month for nonambulatory residents. Residents who are on welfare are charged $300 per month which is paid by welfare funds. All residents of

the facility are required to pay the monthly charge for services which is paid either from their own or family funds or by welfare. About half of the residents pay their own way and the other half receive welfare assistance. At the trial Mrs. Kandt testified that no patient had been evicted or asked to leave because he could not pay the monthly charge. She testified that there had been instances in the past where certain patients had not been able to pay and that debit is still on the books. There is nothing in the record to show that any resident has been admitted to the nursing home under an agreement to pay less than the going rate. There is nothing in the evidence to show that a lesser monthly charge is made by the Lutheran Home, Inc. than is made by other nursing facilities in the county. Residents are not required to pay an entrance fee to enter the home.

At the time of the trial the plaintiff called as a witness Mr. C. Dean Pressnall, a C. P. A., who prepared financial statements for the home including balance sheets and a statement of income and expenditures for each year of operation. The financial records of the corporation disclose that during the 2½ year period from 1967 through June 1970, the outstanding balance on the first mortgage bonds was reduced in the amount of $40,000. In addition they show that there has been a reduction in the amount of $2,529 on the note owed to Mr. Biehler during the same period. Highly summarized the accountant's testimony established that the nursing home is producing more than enough to meet its day-to-day operating expenses and in addition has been able to reduce its long-term indebtedness in the amounts just mentioned. With one exception the only source of income of the home has been the monthly charges paid by the residents of the home. One of the patients, Lucille Arnold, transferred some property to the home of a value of approximately $36,000, in consideration for lifetime care and burial. This transfer of property was treated on the books of the corporation as a payment in advance for care which was prorated yearly at the normal charge for her category as a patient. By the time of the trial in March of 1971 Mrs. Arnold had passed way and the balance of her prepayment was used to pay off some of the corporation bonded indebtedness. The record shows clearly that the nursing home is a viable financial institution relying on the income from its residents and meeting its short-term debts and its long-term obligations as they become due. It should be mentioned

that Lutheran Home, Inc. has been granted a tax exemption status as a nonprofit corporation for income tax purposes by the Internal Revenue Service.

Since the facts are undisputed, the case presents a pure question of law as to whether or not Lutheran Home is entitled to an exemption on the nursing home property under Article 11, Section 1, of the Kansas Constitution and K. S. A. 79-201. Under both the constitutional provision and the statutory provision in order to be entitled to an exemption, Lutheran Home, Inc. has the burden to prove that the nursing home is used exclusively for benevolent or charitable purposes. The parties in this case rely on many decisions of this court pertaining to tax exemption for charitable and benevolent purposes. They cite in particular *Topeka Presbyterian Manor v. Board of County Commissioners*, 195 Kan. 90, 402 P. 2d 802; *Evangelical Village & Bible Conference, Inc. v. Board of County Commrs.*, 207 Kan. 383, 485 P. 2d 343; *In re Estate of Carlson*, 187 Kan. 543, 358 P. 2d 669; *Mason v. Zimmerman*, 81 Kan. 799, 106 Pac. 1005; and *Washburn College v. Commrs of Shawnee Co.*, 8 Kan. 344. We have considered all of those cases along with the many Kansas cases cited therein and the more recent case of *Sigma Alpha Epsilon Fraternal Ass'n. v. Board of County Commrs.*, 207 Kan. 514, 485 P. 2d 1297. All of these decisions recognize certain basic principles of law which are applied in cases of claimed exemption from taxation because of charitable use. These principles may be summarized as follows:

(1) Constitutional and statutory provisions exempting property from taxation are to be strictly construed.

(2) The burden of establishing exemption from taxation is on the one claiming it.

(3) The exemption from taxation depends solely upon the exclusive use made of the property and not upon the ownership or the character, charitable or otherwise, of the owner.

(4) The test of whether an enterprise is charitable for ad valorem tax purposes is whether its property is used exclusively to carry out a purpose recognized in law as charitable.

(5) The question is not whether the property is used partly or even largely for the purposes stated in the exemption provisions, but whether it is used exclusively for those purposes. (*Clements v. Ljungdahl*, 161 Kan. 274, 278, 167 P. 2d 603; *State, ex rel., v. Security Benefit Ass'n*, 149 Kan. 384, 87 P. 2d 560.)

(6) The phrase "used exclusively" as contained in Section 1, Article 11, of the Kansas Constitution, was intended by the framers in the sense that the use made of property sought to be exempt from taxation, must be only, solely,

and purely for the purposes stated in the Constitution, and without admission to participation in any other use. (*Sigma Alpha Epsilon Fraternal Ass'n v. Board of County Comm'rs.*, supra.)

The principles of law set forth above have generally been accepted and followed in all of our decisions. The major problem presented in this case and in other cases of claimed exemption is whether or not a particular use of property falls within the definition of a use for charitable or benevolent purposes. In *Mason v. Zimmerman,* supra, we held that the term "benevolent" as used in the constitutional and statutory provisions, is entirely synonymous with "charitable". The trouble is that there has been and is a wide disagreement as to what constitutes a "charitable" use.

The strict constructionist construes the word "charity" from the concept of the taxpayer citizen. Typical of this approach is the opinion in *Washburn College v. Comm'rs of Shawnee Co.*, supra, decided in 1871. In that opinion Mr. Justice Brewer stated as follows:

"All property receives protection from the State. Every man is secured in the enjoyments of his own, no matter to what use he devotes it. This security and protection carry with them the corresponding obligation to support. It is an obligation which rests equally upon all. It may require military service in time of war, or civil service in time of peace. It always requires pecuniary support. This is taxation. The obligation to pay taxes is co-extensive with the protection received. An exemption from taxation is a release from this obligation. It is the receiving of protection without contributing to the support of the authority which protects. It is an exception to a rule, and is justified and upheld upon the theory of peculiar benefits received by the State from the property exempted. Nevertheless, it is an exception; and they who claim under an exception must show themselves within its terms . . ." (pp. 348-349.)

The more liberal approach to the problem is exemplified in our recent decisions in *Topeka Presbyterian Manor v. Board of County Commissioners*, supra, and *Evangelical Village & Bible Conference, Inc. v. Board of County Commrs.*, supra. The rationale of this approach is that the word "charity" should be given a broad rather than a strict meaning. For example, charity is defined as a gift for some general public use or the accomplishment of some social interest or whatever proceeds from a sense of moral duty or feeling of kindness or humanity for the relief or comfort of another.

The term "charity" in a legal sense is really a matter of description rather than of precise definition and therefore a case involving a determination of that which is charitable must be decided upon

its own particular facts or circumstances. (*Topeka Presbyterian Manor v. Board of County Commissioners*, supra.) In recent years the principles of charitable exemption from taxation have been given close scrutiny and serious consideration by both federal and state courts throughout this country. There has been an increasing trend toward the tightening of exemptions and a return to the more strict view. (Annotations in 37 A. L. R. 3d 565, 37 A. L. R. 3d 1191, and 45 A. L. R. 3d 610; *United Presby. v. Co. Comm.*, (1969) 167 Colo. 485, 448 P. 2d 967; *Presbyterian Homes v. Bradenton*, (Fla. 1966) 190 So. 2d 771; *Wesley Willows v. Munson*, (1969) 43 Ill. 2d 203, 251 N. E. 2d 249; *Paraclete Manor of Kansas City v. State Tax Com'n*, (Mo. 1969) 447 S. W. 2d 311; *County of Douglas v. OEA Senior Citizens, Inc.*, (1961) 172 Neb. 696, 111 N. W. 2d 719; *The Presbyterian Homes v. Division of Tax Appeals*, (1969) 55 N. J. 275, 261 A. 2d 143; *Haines v. St. Petersburg Methodist Home, Inc.*, (Fla. 1965) 173 So. 2d 176; *Ruston Hospital, Inc. v. Riser*, (La. 1966) 191 So. 2d 665, *Friendsview Manor v. Tax Com.*, (1966) 247 Or. 94, 420 P. 2d 77; *Friendship Manor Corporation v. Tax Commission*, 26 Utah 2d 227, 487 P. 2d 1272; *Martin Luther Homes v. County of Los Angeles*, 12 Cal. App. 3d 205, 90 Cal. Rptr. 524; *Stanbro v. Bapt. Home Ass'n*, 172 Colo. 572, 475 P. 2d 23.)

We have reconsidered all of the Kansas decisions along with cases from other jurisdictions. We have concluded that the concept of "charity" as set forth in *Mason v. Zimmerman*, supra, should be applied in this case and in future litigation in this state. In *Mason* we said that "charity" is a gift to promote the welfare of others in need, and "charitable," as used in the constitutional and statutory provisions, means intended for charity. In this sense charity involves the doing of something generous for other human beings who are unable to provide for themselves. To have charity there must be a gift from one who has to one who has not. Unless there is a gift, there can be no charity.

As pointed out above "charity" is sometimes used interchangeably with "benevolence" and "beneficence" in describing good-will, or a helpful attitude or kindly acts, but "charity" is commonly understood more objectively as denoting gifts to the poor or positive steps taken to relieve distress and suffering of those unable to help themselves. It is the latter concept of "charity" and not the former, which is more consistent with our established rule that constitutional and statutory provisions which exempt property from taxation are to be strictly construed.

We also are convinced that "benevolent" as used in the constitutional and statutory provisions has the same meaning as "charitable" used in its objective sense of providing relief to those unable to help themselves. Under this definition of the word "charity" the characteristics of an organized charity are that whatever it does for others it does free of charge, or, at least, so nearly free of charge as to make the charges nominal or negligible, and that those to whom it renders help or services are those who are unable to provide themselves with what the institution provides for them, that is, they are legitimate subjects of charity.

We recognize that this construction of the word "charity" is more restrictive than the liberal construction given the term in *Topeka Presbyterian Manor v. Board of County Commissioners,* supra, and *Evangelical Village & Bible Conference, Inc. v. Board of County Commrs.,* supra. We believe, however, that such an interpretation is more fully in accord with the intent of the framers of the Kansas Constitution as expressed in article 11, section 1 and the intent of the legislature as set forth in K. S. A. 79-201. In view of the strict construction adopted here we, of necessity, overrule *Topeka Presbyterian Manor v. Board of County Commissioners,* supra; *Evangelical Village & Bible Conference, Inc. v. Board of County Commrs.,* supra, and other decisions of this court contrary to our holding here.

When we turn to the factual circumstances shown in this case we have no hesitancy in holding that the Lutheran Home is not entitled to an exemption from taxation under the charitable exemption provisions of the Kansas Constitution and K. S. A. 79-201. The nursing home here is operated essentially as it was under the predecessor corporation. It has the same manager that it had when it first opened its doors. Only the ownership of the home has changed. It is undisputed that the plaintiff corporation expects to be paid for each and every resident in the home. All of the residents either pay the established charges from personal or family funds or are welfare patients whose charges are paid from public funds. Furthermore there is nothing in the record to show that the charges of this nursing home are any less than the established charges of other nursing homes in the community. The evidence is undisputed that the plaintiff corporation receives sufficient income from the residents to pay all expenses of operation and to reduce the bonded indebtedness as principal and interest become due.

The mortgage indebtedness has been reduced $40,000 in the past two and one-half years; a secured note has been reduced during the same period in the approximate amount of $2500. During each year of operation under the plaintiff corporation the interest which the plaintiff has in the ownership of the building and real estate has increased. While it appears that under the present bylaws in case of dissolution its assets could not be distributed to any individual or organization other than a charitable or educational organization, it has a stated corporate life of 100 years and what it could do with the property after the mortgage is paid is not clear. The three trustees are given unlimited power to amend the articles of incorporation and bylaws. We note further that the word "charity" is not used anywhere in the articles of incorporation. We note also that services rendered for the United States or any of its agencies are exempted from the requirement of the bylaws that services rendered by the corporation shall be handled on a cost of doing basis.

The contention that since the plaintiff corporation has been granted a federal income tax exemption as a nonprofit corporation, the exemption shall also extend to corporate real estate is rejected. Under the Federal Internal Revenue Code, income tax exemption does not depend so much upon how the applicant makes its money or how it uses its property as upon how it is currently spending the money it makes. (*Southeastern Fair Ass'n v. United States*, (1943) 52 F. Supp. 219, 100 Ct. Cl. 216; *Haines v. St. Petersburg Methodist Home, Inc.*, supra; annotation in 69 A. L. R. 2d 871.)

The basic reason why an exemption from taxation should be denied in this case is that the record does not disclose the existence of any gift from the plaintiff corporation to the residents of the home or to any one else. There is no sufficient showing of the use of the plaintiff's property for the purpose of promoting the welfare of others in need.

From the entire record we are convinced that the plaintiff organization is substantially compensated for its services and that the residents of the nursing home have not been shown to be charity patients in the sense necessary to sustain the plaintiff's claim of exemption. We thus conclude that the plaintiff corporation, although possibly altruistically motivated and serving a socially constructive purpose, is nevertheless a financially viable institution whose property is not entitled to exemption from taxation.

The judgment of the district court is reversed and the case is remanded with directions to enter a judgment in favor of the defendants, denying to the plaintiff its claim for taxes paid under protest for the year 1969 and the other relief prayed for in the plaintiff's petition in accordance with the views expressed herein.

KAUL, J., (dissenting in part and concurring in part): Because of the rule of stare decisis, which I believe applies with particular force to the decision in this case, I must respectfully dissent from the holdings in paragraphs 7 and 8 of the syllabus and the corresponding portions of the opinion which overrule *Topeka Presbyterian Manor v. Board of County Commissioners,* 195 Kan. 90, 402 P. 2d 802, and all other decisions contrary to today's holding.

The instant case is disposed of by the court's declaration:

"The basic reason why an exemption from taxation should be denied in this case is that the record does not disclose the existence of any gift from the plaintiff corporation to the residents of the home or to any one else."

I fully agree with this reasoning, however, the court proceeds to overrule *Topeka Presbyterian Manor* wherein $400,000.00 was donated in gifts toward construction, and $59,000.00 received in gifts during the first seven months of the operation; a period during which operation of the institution would have been some $50,000.00 in the red but for the gifts.

In today's decision the court holds:

" 'Charitable', as used in such constitutional and statutory provisions, denotes gifts to the poor or positive steps taken to relieve distress and suffering of those unable to help themselves." (Syl. ¶ 7.)

This holding read together with the declaration that *Manor* and other decisions of this court contrary to the holding herein are overruled, clearly imports that none but the destitute can be benefited by an institution that hopes to retain tax exempt status. This holding is not only a complete departure from this court's concept of "charity" in a legal sense, as expressed in *Manor,* but the broad sweep of today's strict construction of "charitable" also contravenes much of the rationale of a number of previous decisions dealing with the subject and relied upon in *Manor, i. e., Nuns of St. Dominic v. Younkin,* 118 Kan. 554, 235 Pac. 869 [1925]; and *Ingleside v. Nation,* 83 Kan. 172, 109 Pac. 984 [1910].

The same principles enunciated by the court herein, including the holding in *Mason v. Zimmerman,* 81 Kan. 799, 106 Pac. 1005, were considered by this court and reconciled with or used to

buttress the decision in the carefully written opinion in *Manor*, which was filed on June 12, 1965. That decision—good or bad—was concurred in by six members of this court, as it was then constituted, and it became the law of this state.

In the *Manor* decision this court recognized that charity comprehends the care and attention of aged people. The court said:

"Historically, courts and taxing authorities alike, including our own highest taxing authorities, have generally treated homes for the aged as charitable organizations." (p. 98.)

Further in the opinion it was stated:

"Traditionally special concern has been shown for the aged. Their peculiar needs arising out of the infirmities of body, mind and spirit that come with advanced age have received the attention of government at all levels and of citizens generally. . . ." (p. 97.)

This was not a new doctrine in this jurisdiction, but actually a projection of the underlying principle involved in *Ingleside v. Nation*, supra. Neither were the factors of admission fees and monthly payments new matters in the consideration of charitable institutions. In this connection, the court in the *Manor* decision discussed in depth the rationale of *Nuns of St. Dominic v. Younkin*, supra, and relied upon it as precedent.

Kansas does not, by any means, stand alone in its categorization of aged with respect to tax exempt status of institutions involved. In recent years, either by case law or constitutionally acceptable statutes, identical or similar concepts have been adopted by many states. (See 37 A. L. R. 3d, Anno., p. 565.) Admittedly, there is a pronounced division of authority and a wide-range of approach to the subject among the various jurisdictions.

The thrust of the *Manor* decision is brought into sharp focus by the court's reference to the case of *Fredericka Home v. County of San Diego*, 35 Cal. (2d) 789, 221 P. 2d 68, wherein it was held:

" 'The concept of charity is not confined to the relief of the needy and destitute. Apart from financial assistance, it comprehends the supply of care and attention to aged people.' " (Syl. ¶ 2.)

The court compared the Fredericka home to the Manor in this fashion:

"The manner of operation of the Fredericka home was substantially similar to the operation of Manor except Fredericka used a 'life care contract' basis for admission, with a more substantial entrance fee. The fees were inadequate to maintain operation of the home without gifts or donations. The court held that in spite of the substantial entrance fee, where the payments were within

reach of persons of limited means and were not commensurate with the costs of the benefits they received, and there was no element of private gain with all of the organization's income devoted exclusively to affording a reasonable standard of care to such persons, the home's property was used exclusively for charitable purposes." (p. 98, 99.)

Taking that quoted above to be the guidelines of the *Manor* holding, I am now convinced, after reexamination, that the holding in *Evangelical Village & Bible Conference, Inc. v. Board of County Commrs.*, 207 Kan. 383, 485 P. 2d 343, was error and that the case was distinguishable as pointed out in the dissenting opinion of Mr. Justice Fontron.

I believe it may fairly be presumed that many homes for the aged have been organized, built and financially structured relying on the 1965 *Manor* decision. Undoubtedly, many aged have paid admission fees, which in numerous cases more than likely constituted the bulk of their life savings. Where a judicial decision has guided numerous people in their conduct or has entered into business transactions, the force of stare decisis, understandably, is particularly strong and courts have been most reluctant to deviate from the established law. (20 Am. Jur. 2d, Courts, § 192, p. 528; 21 C. J. S., Courts, § 216, p. 396.)

Admittedly, the rule of stare decisis does not require the perpetuation of a doctrine which may later appear to have been erroneously adopted because of changes in social or economic conditions or for other persuasive reasons. This court, however, has generally justified the reversal of its position within the context of the rule of stare decisis, *i. e., Carroll v. Kittle,* 203 Kan. 841, 457 P. 2d 21; and *Noel v. Menninger Foundation,* 175 Kan. 751, 267 P. 2d 934. In the record herein there is no showing of, nor does the court recognize, any change since 1965 in the economic or social status of aged citizens that warrants this abrupt reversal of the law. In fact, I think it is a matter of common knowledge that inflation has eroded the status of those aged citizens whose situation we are dealing with.

I was not a member of this court when *Manor* was decided in 1965; however, the mere fact that the composition of a court has changed since it made a previous decision or ruling, is not grounds for deviating from the precedent set by that previous decision. (20 Am. Jur. 2d, Courts, § 187, p. 523.) Whatever my own views may have been on presentation of the issues for the first time, they

are overshadowed by judicial responsibility dictated by the force of stare decisis on a decision dealing with subject matter as is here involved.