R. Milton YORGASON, Salt Lake County Assessor, Plaintiff and Appellant,

v.

COUNTY BOARD OF EQUALIZATION OF SALT LAKE COUNTY, ex rel., EPISCOPAL MANAGEMENT CORPORATION, Defendant and Respondent.

No. 18986.

Supreme Court of Utah.

Feb. 3, 1986.

Theodore L. Cannon, Bill Thomas Peters, Salt Lake City, for plaintiff and appellant.

Kevin N. Anderson, Albert J. Colton, Salt Lake City, for defendant and respondent.

HALL, Chief Justice:

The Salt Lake County Board of Equalization, the State Tax Commission and the district court all found that an apartment building for needy elderly and handicapped families and individuals, known as St. Mark's Tower, was exempt from real property tax because it was used exclusively for charitable purposes. The plaintiff, Salt Lake County Assessor, appeals that determination and asks that St. Mark's Tower be placed upon the tax rolls of Salt Lake County and taxed for the tax years 1980 and following. We affirm.

Episcopal Management Corporation is a Utah nonprofit corporation organized in April 1978. The articles of incorporation state that the corporation was organized "exclusively for charitable purposes." The articles further state that "[t]he specific charitable purpose of this corporation is the promotion of the welfare of needy elderly and handicapped families through the provision of housing for low- and moderate-income individuals who do not possess the

means to furnish themselves with decent, safe, and sanitary housing."

The property at issue here is an apartment building known as St. Mark's Tower in Salt Lake City. The Tower consists of 98 rentable units together with common areas used for social and recreational activities, a resident manager's apartment and several offices used by the Tower's administration. There are no commercial businesses of any type in the building. Social programs are organized and furnished for the tenants without charge, and free counseling is offered. Volunteers take tenants grocery shopping and provide and staff blood pressure clinics, among other things. The philosophy of the Tower is to provide a total continuum of care to its tenants.

In order to build the Tower, volunteers spent approximately 1,250 person hours negotiating with the Department of Housing and Urban Development (HUD) for financing and in negotiations for the building site; in consultation during construction; and in the selection of the managing agent for the Tower. Additionally, the Episcopal Diocese of Utah spent about $1,500 for travel expenses to further the negotiations.

As a result of these volunteer efforts, HUD loaned the corporation $3,638,000 for construction of the Tower under the terms of the National Housing Act of 1959, § 202, 12 U.S.C. § 1701q (1980). The loan was secured by a mortgage payable by the corporation over 40 years. HUD sets the operating requirements of the Tower.[1]

The Tower began accepting tenants on December 27, 1979.[2] In order to be eligible to reside in the Tower, a tenant must be over 62 years of age or handicapped. Handicapped individuals cannot make up more than 10% of the tenants. As of January 1981, no tenant could have income in excess of $12,000 per year if single or $13,700 per year if married.[3] At the time this action commenced, the average annual income of tenants at the Tower was $4,622.

Rent for each unit is established by HUD on the basis of fair market value for equivalent facilities in the community. In January 1981, the established rent was $433 per month per unit. This rent included all utilities except telephone. The percentage of the monthly rental paid by the tenant is based on his or her ability to pay. The tenant pays 25% of his or her gross annual income toward the rent. In 1981, the average rent paid by tenants was $96, with the highest being $199 per month. Thus, no tenant completely pays his or her own way. The difference between the rent the tenant pays and the established fair market rent is paid by HUD to Episcopal Management Corporation in the form of section 8 subsidy payments.[4] Both operating expenses and mortgage payments are paid exclusively from the monthly rental proceeds with any excess applied to reduce the mortgage.[5] There are no earnings over and above expenses.

1. Both the Salt Lake City and the Salt Lake County Housing Authorities provide housing for the same classes of people in apartment complexes built with HUD public housing funds and operated under substantially the same requirements. Neither complex pays property taxes because the properties are owned by municipal corporations and are considered to be public property used for essential public, governmental and charitable purposes. U.C.A., 1953, § 55–18–15; Utah Const. art. 13, § 2 (1968, amended 1982). A 16-story apartment complex on 21st South has agreed to pay $400 in in-lieu payments when the complex gets to a certain point in the bonded indebtedness; Phillip's Plaza, next door to St. Mark's Tower, will pay approximately one-third of that. *See* U.C.A., 1953, § 55–18–27.

2. The Tower initially accepted tenants from the waiting list established to fill vacancies at the public apartment complex operated by the county.

3. This limit has since been reduced.

4. United States Housing Act of 1937, § 8, 42 U.S.C. 1437f (1978).

5. The amount of the tax assessment ($40,000) is approximately equal to the total amount taken in each year in rents plus federal subsidies. Testimony at the hearing indicated that there was no apparent source of funds to pay the tax assessment. Rent, of course, cannot be raised, and it was considered unlikely that the federal government would provide additional subsidies to pay property taxes. It was therefore uncertain where money for the tax assessment would come from.

HUD regulations require that nonprofit corporations financed under section 1701q of the National Housing Act enter into management contracts. Therefore, St. Mark's Tower is managed by Danville Development Corporation, which receives as its fee 7% of the gross rents collected. The Tower also has a resident director who has a B.A. in psychology with a certification in gerontology. Policy decisions for the Tower are made by a board of directors consisting of from five to nine members, one of whom must be the Bishop of the Episcopal Diocese of Utah. The board meets once a month, and all members are volunteers serving without compensation.

Upon dissolution of the corporation, the assets of the corporation must be disposed of to benefit an exempt organization under section 501(c)(3) of the Internal Revenue Code of 1954 (organizations operated exclusively for charitable, educational, religious or scientific purposes).

In 1980, the Salt Lake County Assessor assessed and taxed St. Mark's Tower.[6] The tax assessment on the Tower was approximately $40,000 per year. Episcopal Management Corporation sought review of that assessment before the Salt Lake County Board of Equalization, which found the Tower to be exempt from real property tax because it was used exclusively for charitable purposes within the meaning of article 13, section 2 of the Utah Constitution. The State Tax Commission and the Third District Court affirmed the ruling of the Board of Equalization. The Salt Lake County Assesor appeals, contending that the prop-erty's use as housing for needy elderly and handicapped individuals is not exclusively a charitable one as defined by article 13, section 2, of the Utah Constitution.

Article 13, section 2 at the time of these proceedings[7] stated in pertinent part: "The property of the state, counties, cities, towns, school districts, municipal corporations and public libraries, lots with buildings thereon used exclusively for either religious worship or charitable purposes, ... shall be exempt from taxation."

Plaintiff contends that the use of the Tower to provide housing for needy elderly and handicapped families and individuals is not a truly charitable one and that the finding of a charitable use by both the tax commission and the district court impermissibly expands the language of article 13, section 2.

This Court has adopted the general rule that the language of the clause exempting property "used exclusively ... for charitable purposes" from taxation should be strictly construed.[8] This does not mean however that purposes exclusively charitable are limited to the mere relief of the destitute or the giving of alms.[9] In fact, what qualifies as a purpose exclusively charitable is "subject to judgment in the light of changing community mores."[10] With this in mind, a number of states have recognized that provision of low-cost housing to low-income handicapped and elderly people in a proper environment constitutes charity.[11]

---

6. St. Mark's Tower is exempt from federal taxes under section 501(c)(3) of the Internal Revenue Code.

7. Article 13, section 2 was amended in 1982, effective January 1, 1983.

8. *Salt Lake County v. Tax Comm'n ex rel. Laborers Local No. 295*, Utah, 658 P.2d 1192, 1194 (1983); *Loyal Order of Moose No. 259 v. County Bd. of Equalization*, Utah, 657 P.2d 257, 264 (1982). *Accord, Utah County v. Intermountain Health Care, Inc.*, Utah, 709 P.2d 265 (1985).

9. *See, e.g., Bader Realty & Inv. Co. v. St. Louis Hous. Auth.*, 358 Mo. 747, 752, 217 S.W.2d 489, 492 (1949).

10. *Salt Lake County v. Tax Comm'n ex rel. Greater Salt Lake Recreational Facilities*, Utah, 596 P.2d 641, 643 (1979).

11. *Memorial Hospital v. Sparks*, 9 Ariz. App. 478, 481–82, 453 P.2d 989, 992–93 (1969); *Franciscan Tertiary Province, Inc. v. State Tax Comm'n*, Mo., 566 S.W.2d 213, 225 (1978); *Senior Citizens Hous. Dev. Corp. v. City of Claremont*, 122 N.H. 1104, 453 A.2d 1307, 1309–10 (1982); *Belle Harbor Home of The Sages, Inc. v. Tishelman*, 100 Misc.2d 911, 420 N.Y.S.2d 343, 345 (1979), *aff'd*, 81 A.D.2d 886, 441 N.Y.S.2d 413 (1981); *Glass v. Oklahoma Methodist Home for the Aged, Inc.*, Okla., 502 P.2d 1268, 1274 (1972). *See generally* Annot., 37 A.L.R.3d 1191 (1971); Annot., 37 A.L.R.3d 565 (1971).

■ In Utah, it is the use to which the real property is put, not the nature of the owning organization, which is determinative of whether or not the property is exempt as being used exclusively for charitable purposes.[12] The test of charitable purpose is public benefit or contribution to the common good or the public welfare.[13] It is also necessary that there be an element of gift to the community.[14]

In *Utah County v. Intermountain Health Care, Inc.,*[15] the Court articulated six factors which consolidate some of the traditional factors considered by this Court and provide useful guidelines in determining whether a particular institution is using its property exclusively for charitable purposes. These are:

(1) whether the stated purpose of the entity is to provide a significant service to others without immediate expectation of material reward; (2) whether the entity is supported, and to what extent, by donations and gifts; (3) whether the recipients of the "charity" are required to pay for the assistance received, in whole or in part; (4) whether the income received from all sources (gifts, donations, and payment from recipients) produces a "profit" to the entity in the sense that the income exceeds operating and long-term maintenance expenses; (5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the restriction bears a reasonable relationship to the entity's charitable objectives; and (6) whether dividends or some other form of financial benefit, or assets upon dissolution, are available to private interests, and whether the entity is organized and operated so that any commercial activities are subordinate or incidental to charitable ones.[16]

■ As can be seen from the foregoing facts and the following discussion, the Tower qualifies as a charitable use under all six of these guidelines and under the Court's traditional analyses.

Both this state and the Congress of the United States have recognized that the community benefits from efforts made to provide adequate housing for the low-income elderly and handicapped members of our society. The Utah State Legislature has stated:

It is declared to be the policy of the state of Utah to promote the general welfare of its citizens that it is necessary to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban and rural areas. These conditions cause an increase and spread of disease and crime, and constitute a menace to the health, safety, morals and welfare of the state. It is the policy of the state of Utah to make adequate provision of housing for persons of low income, for elderly persons of low income, for handicapped persons of low income, for veterans of low income unable to provide themselves with decent housing on the basis of benefits available to them through certain government guarantees of loans for purchase of residential property, and during limited periods, housing for disaster victims. The provision of safe and sanitary dwelling accommodations at rents or prices which persons of low income can afford will materially assist in developing more desirable neighborhoods and alleviating the effects of poverty in this state. The purposes of this act are to meet these problems by providing low-cost housing for low-in-

---

**12.** *Friendship Manor Corp. v. Tax Comm'n,* 26 Utah 2d 227, 234, 487 P.2d 1272, 1276 (1971).

**13.** *Greater Salt Lake Recreational Facilities,* 596 P.2d at 643. *Accord Laborers Local No. 295,* 658 P.2d at 1197 (Oaks, J., concurring).

**14.** *Intermountain Health Care,* 709 P.2d at 269; *Greater Salt Lake Recreational Facilities,* 596 P.2d at 643.

**15.** 709 P.2d at 265.

**16.** 709 P.2d at 269–70 (footnote omitted). We emphasize that these factors operate as guidelines only and should not be read to be exclusive or as equally beneficial in each case.

come persons and to encourage co-operation between political subdivisions thereby making available low-cost housing facilities in all areas of the state. It is in the public interest to utilize the broad financial resources and technical services available to government in co-operation with the ingenuity and expertise of private enterprise to alleviate this lack of safe and sanitary dwellings while stimulating local industry.[17]

It should be noted that the above statement of policy not only applies to actions by government, but encourages "co-operation with the ingenuity and expertise of private enterprise."

Congress articulated a similar purpose when it passed the National Housing Act:

The Congress finds that there is a large and growing need for suitable housing for older people both in urban and rural areas. Our older citizens face special problems in meeting their housing needs because of the prevalence of modest and limited incomes among the elderly, their difficulty in obtaining liberal long-term home mortgage credit, and their need for housing planned and designed to include features necessary to the safety and convenience of the occupants in a suitable neighborhood environment. The Congress further finds that the present programs for housing the elderly under the Department of Housing and Urban Development have proven the value of Federal credit assistance in this field and at the same time demonstrated the urgent need for an expanded and more comprehensive effort to meet our responsibilities to our senior citizens.[18]

Congress reaffirmed these purposes in the Low-Income Housing Act:

It is the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income and, consistent with the objectives of this chapter, to vest in local public housing agencies the maximum amount of responsibility in the administration of their housing programs....[19]

Undisputed testimony before the tax commission indicated that there was a very high proportion of low-income displaced elderly in Salt Lake County. This situation is due largely to the trend of converting older apartment buildings, where many elderly lived, to modern condominium complexes whose rental fees or purchase prices were well beyond the financial capabilities of individuals who had lived in the older apartment buildings for 20, 30 or even 50 years and who are on low fixed incomes. Low-cost, privately owned housing for those displaced individuals is simply not available.

It was undisputed that none of the residents of the Tower would be able to live in comparable housing to that provided at the Tower anywhere else in Salt Lake County for the amount of rent each resident paid at the Tower. In fact, many tenants of the Tower were taken from substandard housing situations, including apartments or rooms infested with cockroaches, with dirt floors, without running water or with minimal facilities.

A project such as the Tower plainly serves an important social need both to the community as a whole, for the reasons stated by the Utah Legislature, and to the individuals residing in the Tower.[20] Such projects are designed and operated to encourage continued activity and further development on the part of its tenants. Testi-

17. U.C.A., 1953, § 55–18–1.

18. 12 U.S.C. § 1701r (1982).

19. 42 U.S.C. § 1437 (1976).

20. "Even the benefiting of a limited and identifiable class can be charitable if that result is also beneficial to the public." (Citations omitted.) *Laborers Local No. 295,* 658 P.2d at 1197 (Oaks, J., concurring).

mony before the tax commission affirmed that the activities provided and the continued companionship available in such projects contributed to the physical, spiritual, social and psychological needs of the elderly and handicapped tenants, many of whom tended to otherwise become increasingly isolated. Further, as the Missouri Supreme Court said in *Franciscan Tertiary Province*,[21] such projects "help prolong life and health by reaffirming the sense that life is worth living, that society cares."[22]

In addition to the benefit provided to the community and the individuals residing in the Tower, the Tower provides a gift to the community.

First of all, Episcopal Management Corporation has made and continues to make substantial contributions of both money (defendant is responsible for the repayment of the loan made by HUD for construction of the Tower no matter what the source of income or shortfall in income; $1,500 unreimbursed travel expenses) and services (the initiative to conceive and then follow through and build the Tower; 1,250 person hours contributed by volunteers from idea to opening; volunteer members of the Board of Directors meet monthly to set policy; continuing volunteerism at the Tower providing a variety of services to residents). Second, there is a substantial imbalance in the exchange between Episcopal Management Corporation and the tenants of the Tower. No tenant begins to pay for the total cost of renting an apartment and for the various services provided.

In *Friendship Manor Corp. v. Tax Commission*,[23] this Court, in refusing to exempt from taxation a home for the elderly, established a test for determining what characteristics a home for the elderly would have to possess in order to be properly used exclusively for charitable purposes. *Friendship Manor* involved an apartment building of 228 units. Tenants in the building had to be ambulatory, and 80% of them had to be over 62 years of age. Each tenant had to be financially able to fully pay the rent established and for all services provided to them. The Manor would not accept tenants if they were not financially able to pay the rent and for all services received or if they could not maintain the standard of living required. Rents were established so that the total amount collected met all expenses plus amortization of interest and principal on the mortgage. Certain commercial businesses were also allowed to operate in the building. The Utah Supreme Court ruled that under these facts the Manor should not be exempt from taxation:

> *Where the senior citizen is paying for all of the services he receives and the rental of the apartments is not determined by need,* but is determined by what is required to retire the principle and interest of the mortgage, together with all upkeep and operation expenses, *no charitable purpose is involved.* The State does not have the obligation to provide living accommodations to persons well able and willing to pay for their needs.[24]

(Emphasis added.)

In so holding, the Court adopted what has been characterized as the "material reciprocity" test for determining whether a housing complex for elderly and handicapped people is a charitable use.[25] If rental payments are insufficient to cover the cost of the complex and are adjusted to reflect each tenant's ability to pay, then a charitable exemption is available; otherwise, it is not. In the case of St. Mark's Tower, none of the tenants are able to fully pay for their needs. The rental paid by each tenant is based on ability to pay, and no tenant begins to pay for the total cost of rental and services received.

21.  566 S.W.2d at 213.

22.  *Id.* at 225.

23.  26 Utah 2d at 227, 487 P.2d at 1272.

24.  *Id.* at 239, 487 P.2d at 1280.

25.  *Id.* at 238, 487 P.2d at 1279 (*quoting United Presbyterian Ass'n v. Board of County Comm'rs,* 167 Colo. 485, 503, 448 P.2d 967, 976 (1968).

■ Other jurisdictions across the country have also held that in order to qualify as an exclusively charitable organization assistance does not have to be cost-free.[26] An organization or institution may still qualify for a tax exemption even if some charges are made to the recipients or residents to help cover operating expenses, as long as these charges are not commensurate with the benefits provided.[27] The fact that subsidization of part of the cost of furnishing low-cost housing such as that provided by the Tower is by the government rather than by a private donor does not dictate a different result.[28]

The Tower also provides a gift to the community since it lessens a government burden. Undisputed testimony before the tax commission indicated that at least eleven residents of the Tower, and probably more, would have to be in nursing homes if the Tower, together with its services and philosophy, was not available. Nursing home costs in Salt Lake County ranged between $1,000 and $1,500 per month at the time this action commenced. Those eleven-plus residents of the Tower would be totally dependent on Medicaid to pay all costs within six months of entering a nursing home. The lessening of the government's burden from this one aspect alone, even deducting the government subsidies, more than outweighs the tax benefits that would be realized by assessing the Tower.[29]

Additional testimony before the tax commission indicated that there were also substantial savings to the government from reduced use of food stamps, lessened medical care, reduced home delivery community services to isolated individuals, and so on. Finally, the executive director of the Salt Lake County Housing Authority testified that if the Tower did not exist, the County, in one fashion or another, would have to provide those services to the residents.

■ Plaintiff, however, contends that the fact that the Tower accepts government subsidies in order to operate precludes the Tower from being accorded a charitable exemption. This argument fails for several reasons. First, and most importantly, as this Court said in *Friendship Manor:* "It is the *use* to which it puts its real property which is the determination of whether or not such property is exempt." (Emphasis added.)[30] The use of the property is obviously a charitable one as discussed previously.

Second, the section 8 government subsidy payments are provided to the project. Thus, those payments are like a gift or donation of any other kind except they come from the government. In both *Intermountain Health Care* and the present case, the crux is the presence or absence of material reciprocity. It is entirely irrelevant to this analysis that the government, rather than a private benefactor, chose to make up the deficit resulting from the exchange between St. Mark's Tower and the tenants by making a contribution to the landlord, just as it would have been irrelevant in *Intermountain Health Care* if the patients' income supplements had come from private individuals rather than the government.

Therefore, the fact that subsidization of part of the cost of furnishing such housing is by the government rather than private charitable contributions does not dictate

**26.** *See, e.g., Santa Catalina Island Conservancy v. County of Los Angeles,* 126 Cal.App.3d 221, 236, 178 Cal.Rptr. 708, 716 (1981); *Martin Luther Homes v. County of Los Angeles,* 12 Cal. App.3d 205, 211, 90 Cal.Rptr. 524, 527 (1970); *Michigan Baptist Homes & Div. Co. v. City of Ann Arbor,* 396 Mich. 660, 670, 242 N.W.2d 749, 753 (1976); *Belle Harbor Home of the Sages, Inc.,* 420 N.Y.S.2d at 345.

**27.** *See id. See also supra* note 11 and cases cited therein.

**28.** *Franciscan Tertiary Province,* 566 S.W.2d at 226.

**29.** Eleven residents at $1,000 per month for twelve months adds up to a cost of $132,000. The County has taxed the Tower at approximately $40,000 per year. Government rent subsidies per year are approximately $33,026 (rent, $433, minus average rent paid by tenants, $96, × 98 units).

**30.** 26 Utah 2d at 234, 487 P.2d at 1276.

the denial of a charitable exemption if the facts otherwise support such an exemption, as they do here.

Operation of St. Mark's Tower by the Episcopal Management Corporation clearly meets all of the tests established by this Court to determine whether or not a given property is used exclusively for charitable purposes. Therefore, we conclude that the tax commission and the district court were correct in exempting the Tower from property tax. Affirmed.

DURHAM, J., concurs.

ZIMMERMAN, Justice: concurring separately.

I join in the majority opinion, but add several observations.

I agree that the six variables set out in *Utah County v. Intermountain Health Care*, Utah, 709 P.2d 265 (1985), are useful in focusing on the general factors relevant to a determination of the presence or absence of a gift, the critical element in deciding whether a charitable exemption is available. However, for the purposes of determining whether a housing project has demonstrated the presence of a gift and, therefore, qualifies for the exemption, I consider the fact-specific analytical framework set forth in *Friendship Manor Corp. v. Tax Commission*, 26 Utah 2d 227, 487 P.2d 1272 (1971), to be of more use.[1]

In *Friendship Manor*, this Court held that although the property in question, a housing project, was operated on a nonprofit basis, it was not used exclusively for charitable purposes because the landlord did not confer a gift upon both the public and the tenants.[2] *See Friendship Manor Corp. v. Tax Commission*, 26 Utah 2d at 239, 487 P.2d at 1280; *cf. Salt Lake Lodge No. 85 v. Groesbeck*, 40 Utah 1, 8–9, 120 P. 192, 194 (1911), *overruled on other grounds, Loyal Order of Moose, No. 259 v. County Board of Equalization*, Utah, 657 P.2d 257 (1982). Even without reference to the six-factor analysis of *Utah County, Friendship Manor* provides ample guidance for determining whether St. Mark's Tower meets this two-pronged gift test.

1. The majority in *Utah County* took its articulation of the six-factor analysis from a Minnesota Supreme Court case. However, as the majority opinion in the instant case implicitly acknowledges, the considerations those six factors are designed to take into account do not appear to be substantially different than those this Court has traditionally canvassed in deciding whether the use to which institutions within a certain category put their property renders the property tax-exempt. *See, e.g., Parker v. Quinn*, 23 Utah 332, 338–39, 64 P. 961, 962 (1901); *William Budge Memorial Hospital v. Maughan*, 79 Utah 516, 523, 3 P.2d 258, 261 (1931); *Youth Tennis Foundation v. Tax Commission*, Utah, 554 P.2d 220, 221 (1976); *Salt Lake County v. Tax Commission*, Utah, 596 P.2d 641, 643 (1979); *Salt Lake County v. Tax Commission*, Utah, 658 P.2d 1192, 1197–99 (1983) (Oaks, J., concurring).

The six-factor analysis may be useful to this Court in determining whether any particular category of institutions qualifies for a property tax exemption, *e.g.*, hospitals or housing for the poor. However, if the six factors are used as *Utah County* suggests—as guidelines only, with the liberty to accord different factors different weight and without requiring that all of them be satisfied—they may be of limited utility in determining whether any specific piece of property used by an institution within one of those categories is entitled to an exemption unless reference is also made to specific facts of cases dealing with analogous institutions. This, I take it, is the reason for the Chief Justice's focus on *Friendship Manor*. In my opinion, tax assessment bodies would be well advised to review any particular claim in light of the facts of cases decided by this Court that deal with property owned by institutions within that same general category and that are not at odds with the restrictive approach to the charitable exemption taken in our recent decisions, such as *Loyal Order of Moose, No. 259 v. County Board of Equalization*, Utah, 657 P.2d 257 (1982), and *Utah County*. Of course, in those areas where there is no case law, decisions may have to be based on general principles. However, even in such situations they should not rely solely on an abstract analysis of *Utah County*'s six factors, but should also consider the role each of those factors has played in our pre-*Utah County* cases.

2. This two-pronged gift requirement is phrased somewhat differently in the Chief Justice's opinion, to wit: a need for "public benefit or contribution to the common good or the public welfare" and a "gift to the community." Judging by how the Chief Justice has used his test, there appears to be no significance to the difference in the terms we use. His language is taken from prior cases; mine is an articulation of what I consider to be the substance of the test currently used by this Court and applied in *Friendship Manor*.

The first aspect of the gift test requires that the project in question confer a gift upon the tenants. As the Chief Justice notes, the Court in *Friendship Manor* found that this element of the test was not met because the exchange between the landlord and the tenants could be characterized as one in which there was "material reciprocity": the landlord experienced no out-of-pocket losses because each tenant had to carry his or her full share of the costs of running the project. Although nothing in the opinion indicates that the rents charged by the not-for-profit landlord were less than the rents the tenants would have had to pay in similar for-profit residences, the tenants presumably realized some economic benefit by reason of the fact that the rent did not include an increment that otherwise would have been necessary to provide the owners with a profit. However, even if the tenants did pay less than they would have paid elsewhere, the opinion does not suggest that such an economic benefit would be sufficient to satisfy the element of gift to the tenants that is necessary for an exemption. This seems reasonable. The mere forgoing of a profit ought not be enough to qualify one for the charitable exemption. For an exchange to lack "material reciprocity," it must result in a material flow of wealth or equivalent to the recipient. *Cf.* 26 Utah 2d at 238–39, 487 P.2d at 1279–80.

The second prong of the gift test is that there must be a gift or benefit to the public. The statement in *Friendship Manor* that "[t]he state does not have the obligation to provide living accommodations to persons well able and willing to pay for their needs," 26 Utah 2d at 239, 487 P.2d at 1280, amounted to a finding that the state had not received any benefit or "gift" from the operation of the project because absent the project, the tenants would not have been objects of public charity.

The conclusion to be drawn from *Friendship Manor* and the cases upon which it relied is that both prongs of the gift test are satisfied where property is used by a nonprofit entity to provide housing for the poor under circumstances where there is a lack of material reciprocity between the tenants and the landlord. The unequal exchange of value provides the necessary element of gift to the recipient,[3] and the provision of decent housing for those unable to pay for it confers a benefit on the state. In the present case, these criteria are obviously satisfied, as the Chief Justice ably documents.

The dissenters take the position that this case is not distinguishable from *Utah County*, from which they dissented also, and that if the hospitals in *Utah County* could not qualify for the exemption, then St. Mark's Tower cannot either. I think they misperceive what *Utah County* held.

First, the dissent argues that there is no difference between the medicare payments made to the hospitals and the subsidy paid to St. Mark's Tower. The majority in *Utah County* took the medicare payments into account in determining that there was no lack of material reciprocity between the hospitals and their patients; if the federal subsidy to St. Mark's Tower is considered, there is also no lack of material reciprocity between the Tower and its tenants.

The dissent ignores the nature of the material reciprocity requirement of *Friendship Manor*, which was used by the *Utah County* Court. *See* 709 P.2d at 269, 274. It does not weigh all the monies received from all sources, on the one hand, and the cost of the services provided, on the other, and determine that a gift occurs only when the result is a net material flow of wealth to the recipient. Such a test would be useless because it could not be satisfied by any viable charitable entity. Only those entities that could demonstrate a fatal hemorrhaging of assets and their candidacy for sure bankruptcy could show a lack of material reciprocity. By looking rather

---

**3.** *Utah County* is in no way inconsistent with *Friendship Manor* or with the result in this case. The hospitals in *Utah County* failed to affirmatively demonstrate the absence of material reciprocity between the hospitals and any significant percentage of their patients. This failure of proof was fatal to their claim of exemption. 709 P.2d at 269, 274.

narrowly at the transactions between the provider of goods or services and the recipient, the test seeks to identify those making a gift to individuals. If those exchanges are classic arm's-length market transactions in which a roughly equal exchange occurs, then there is no gift. On the other hand, if the transactions are not market transactions but result in a material flow of wealth to the recipient, then a gift is present and the provider has met one aspect of the test for charity. Under this view of the material reciprocity test, the medicare subsidies in *Utah County* were properly considered in determining whether that test was met, while the subsidy to the Tower should be excluded from any such analysis.

When a person receives an income supplement from any source that can be used in the open market to pay for services from any number of providers, and an exchange of money and/or the supplement for services takes place, the supplement should be included in determining whether there is material reciprocity in the exchange. The provider is willing to furnish the service for money and does not care whether the recipient's ability to pay comes from a steady job, a rich uncle, a charitable foundation, or an income supplement provided by the government. To exclude the income supplement from consideration would be to ignore a relevant factor in the decision of the provider to serve that particular recipient. The medicare payments in *Utah County* come within this analysis.

The subsidy received by St. Mark's Tower is distinguishable. When a person does not have an income supplement that can be discretionarily spent in the market, the only element of exchange he or she brings to a transaction with a provider of services is his or her personal assets. If the person is unable to pay the full cost of the services and the provider is nonetheless willing to furnish them, then the provider has conferred a gift upon the individual recipient sufficient to satisfy *Friendship Manor* and *Utah County*. This is the classic way charities operate. Obviously, if the provider is to continue to operate in this manner,

someone must make up the asset drain that results from such transactions, yet that fact certainly does not bar the presence of a gift, as I am sure the dissenters would acknowledge. If the government, rather than a private benefactor, chooses to make up the deficit by a contribution to the provider, that does not alter the character of the exchange between the provider and the recipient. It also does not change the charitable character of the use to which the provider's property is being put. The exemption should be available.

The second argument advanced by the assessor and adopted by the dissent to defeat the exemption is that there is no gift to the public. The dissent contends that the Salt Lake County taxpayers' financial burden of caring for the poor who are elderly and handicapped has not been lessened by the activities of St. Mark's Tower because there has been a simple "shifting [of] financial burden from local and state government to the federal government." This position is without merit for several reasons.

First, it seems clear that financially, Salt Lake County residents, as local and state taxpayers, benefit financially from St. Mark's Tower. As the Chief Justice notes, there is ample record evidence to support the proposition that the property taxes lost by reason of St. Mark's Tower's exemption would not have been sufficient for the county or the state to provide equivalent housing and services for the Tower's tenants.

Second, the assessor and the dissent assume that before the public benefit prong of the gift test can be satisfied, a detailed financial analysis must be made to determine whether the granting of a property tax exemption produces a net financial gain for the taxpayers of the governmental entity in question: absent a net gain, the exemption should be unavailable. As I understand the argument of the assessor and the dissent, to show a net financial gain would require proving that the public entity could not have furnished services equiv-

alent to those provided by the charity for an amount equal to or less than the revenue lost by reason of the exemption. And in performing this analysis, any subsidies provided the charity by any governmental entity would be excluded from consideration.[4] To my knowledge, no such net financial gain test has ever been applied in Utah before, although we have certainly used language suggesting that a financial gain is *presumed* to result from traditional charitable activities directed to those who would otherwise be a public burden. *See, e.g., Salt Lake Lodge No. 85, B.P.O.E. v. Groesbeck,* 40 Utah 1, 8, 120 P. 192, 194 (1911), *quoted in Loyal Order of Moose, No. 259 v. County Board Equalization,* Utah, 657 P.2d 257, 261 n.1 (1982). Indulging in such a presumption is reasonable, especially when dealing with an entity performing a function such as providing housing to the poor, a classic charitable activity under any definition of the word. But I see no good reason to accept the dissent's suggestion that instead of a presumption, we should require detailed proof of financial benefit before awarding any charitable entity a property tax exemption.

Brief reflection demonstrates the unworkability of the "net financial gain" test seemingly advocated by the dissent. First, it would be very difficult in most cases to determine whether the government could have performed a charity's work for the same or less than the amount the government lost by reason of the charity's tax exemption. Few charitable entities could be sure from year to year that the net gain calculus would entitle them to a property

tax exemption. Moreover, this test would hit hardest those performing charitable works primarily through the use and occupancy of real estate having a high value, such as housing projects. Second, excluding the amount of any governmental subsidies from the net gain calculation would add additional year-to-year uncertainties regarding the availability of an exemption, for it is common knowledge that many such entities receive some governmental support and that the amount of support varies from year to year, depending on the vagaries of governmental budgets and policies.

The uncertainties the net financial gain standard would introduce into the exemption question would have devastating financial consequences for charitable enterprises because the outcome of the analysis would be difficult to predict in advance. An entity's property might be exempt one year and taxable the next, with the consequence that its costs of operation could fluctuate wildly from year to year, depending upon whether it had to pay property taxes. Certainty in financial planning is what these entities need, and that cannot be secured if the availability of a property tax exemption is dependent upon the vagaries of each year's funding sources and the assessor's determination of whether government could perform the same service for less.

For the foregoing reasons, I join in the Court's holding that St. Mark's Tower is entitled to the property tax exemption provided in article XIII, section 2 of the Utah Constitution.[5]

4. The Chief Justice, by responding to this argument in his discussion of public benefit, might be seen as implicitly accepting its premises. However, I do not so read his opinion.

5. I assume that all the property in question is used exclusively for charitable purposes because every person in St. Mark's Tower is participating in an exchange that lacks material reciprocity. An issue not raised or dealt with in *Utah County* and also not raised here is whether all the property of an institution qualifying for the constitutional exemption can be exempted from property taxation if only some of the transactions between the institution and the recipients of goods or services lack material reciprocity.

· *Loyal Order of Moose, No. 259 v. County Board of Equalization,* Utah, 657 P.2d 257 (1982), reinstated the rule of *Parker v. Quinn,* 23 Utah 332, 64 P. 961 (1901), that separate parts of a building used for exclusively charitable purposes may be exempted even if other parts are used for noncharitable purposes; however, if the building is jointly used for charitable and a more than *de minimis* amount of noncharitable activity, then the exemption is entirely lost. 657 P.2d at 263–64.

The rule in *Parker* will create obvious problems under today's decision and under *Utah County*. Although it might appear relatively easy for a housing project of mixed use with long-term tenants to qualify under *Parker* be-

HOWE, Justice: dissenting.

I dissent. The opinion of the Chief Justice and Justice Zimmerman are at variance with the principles set down in *Utah County v. Intermountain Health Care, Inc.*, Utah, 709 P.2d 265 (1985). While I dissented in that case, I recognize that it constitutes the controlling law on charitable exemptions in this state. There, the two hospitals failed to qualify for a charitable exemption because they did not demonstrate that they made a substantial gift of services to their patients. The daily operating expenses of the hospitals were covered by its patients' payments. Said this Court:

> [The] current operating expenses for both hospitals are covered almost entirely by revenue from patient charges. Although a substantial donation to capital was identified in the case of Utah Valley Hospital, there was no demonstration of the impact of that donation on the current support, maintenance, and operation of that hospital in the tax year in question in this lawsuit.
>
> .     .     .     .     .
>
> The record also shows that neither of the hospitals in this case demonstrated any substantial imbalance between the value of the services it provides and the payments it receives apart from any gifts, donations, or endowments. The record shows that the vast majority of the services provided by these two hospitals are paid for by *government programs,* private insurance companies, or the individuals receiving care. Collection of such remuneration does not constitute giving, but is a mere reciprocal exchange of services for money.

*Id.* at 273–74 (emphasis added).

In the instant case, each tenant pays a portion of the rent and the balance is made up by a government program, *viz.,* federal subsidy. The amount of the rent is fixed at the prevailing rate in the market. The rent covers the full operating expenses of St. Marks Towers, including mortgage payments. No deficit remains which must be covered by a gift from Episcopal Management or other sources. I am unable to see how this arrangement varies from that in *Utah County v. Intermountain Health Care, Inc., supra,* where the hospital rendered services to patients who received medicare payments from the federal government to assist them. Indeed, the medicare payment seldom covered the hospitals' cost of services and the hospitals absorbed the deficit. In the instant case, the payment from the federal government plus the amount paid by the tenant fully covers the tenant's costs. Episcopal Management contributes nothing toward the daily operating expenses. The opinions of the Chief Justice and Justice Zimmerman seek to distinguish medicare payments from federal housing subsidy on the ground that medicare is given on the basis of personal entitlement, whereas federal housing subsidy is given to the project. This attempted distinction is fallacious. The subsidy is given to the project only because eligible persons reside therein. Medicare payments, too, are paid directly to the hospital but only for eligible patients therein.

The opinion of the Chief Justice also seeks to justify the exemption in this case on the ground that a government burden is lessened. That basis, too, is faulty. In actuality, what happens here is simply shifting the burden for providing housing for the elderly and handicapped from local and state government to the federal government. The taxpayers of Salt Lake County and of the State of Utah are also taxpayers of the federal government. Shifting the financial burden from local and state government to the federal

---

cause each room could be labeled charitable or noncharitable based upon the status of its occupant, difficulties would be encountered by any institution where physical facilities are used in common by recipients of charity and by those paying in full. Examples that come to mind are common areas in mixed-use housing projects and most of the facilities of a mixed-use hospital. The rigid rule of *Parker* was adopted in a different environment and almost certainly will have to be modified if different types of institutions devoting similar proportions of their resources to charity are to be treated similarly.

government does not relieve the taxpayers of Salt Lake County from any burden. The principle that a charitable exemption should be given to property which is used in a manner so as to relieve the government from a burden is simply not satisfied under these facts. When non-tax revenues are used, such as contributions and gifts from private sources, to finance activities which otherwise would have to be borne by the taxpayers, a charitable exemption is justified. When property such as St. Marks Tower is taken off the tax rolls, the remaining taxpayers must make up the loss of revenue which occurs because of the exemption. This additional burden on the taxpayers has been justified on the ground that they are given corresponding relief from maintaining the services, activities, and programs which are conducted on the exempt property which otherwise would be funded from tax dollars. That quid pro quo is not realized in this case where the taxpayers are not relieved of any burden because the burden is simply shifted from one government entity to another.

The opinion of the Chief Justice places reliance upon the fact that Episcopal Management Corporation is a non-profit corporation; that it is exempt from taxation under the Internal Revenue Code; that its board of trustees serves without compensation; that hundreds of hours of volunteer time were donated to negotiate the financing with HUD; and that $1,500 for travel expenses were also expended. These same things were true with Intermountain Health Care and the two hospitals involved in *Utah County v. Intermountain Health Care, Inc., supra.* Indeed, in the case of the Utah Valley Hospital more than $4,000,000 had been donated by members of the community to add an addition. We held that effort was not relevant to the granting of a charitable exemption because "there was no demonstration of the impact of that donation on the current support, maintenance, and operation of that hospital in the tax year in question." The same problem exists in the instant case. It does not appear that the donation of volunteer time and $1,500 of

travel expenses has in any way reduced the amount of rent paid by the tenant or the federal government. The tenant's total rent remains at the prevailing market rate. This was fatal to the claim for exemption in *Utah Valley v. Intermountain Health Care, Inc., supra,* where we said:

> The evidence was that both hospitals charge rates for their services comparable to rates being charged by other similar entities, and no showing was made that the donations identified resulted in charges to patients below prevailing market rates.

*Id.* at 273 (footnote omitted).

I agree with the Chief Justice that St. Marks Tower serves an important social need in its community and to the individuals residing therein. This need was conceded in *Utah Valley v. Intermountain Health Care, Inc., supra,* but we held that much more had to be shown to qualify for a charitable exemption. The opinion of the Chief Justice states that "[T]he test of charitable purpose is public benefit or contribution to the common good or the public welfare," and that a charitable purpose is not "limited to the mere relief of the destitute or the giving of alms." These broad principles were held not to be controlling in *Utah County v. Intermountain Health Care, Inc., supra,* where specific tests for a charitable institution were enunciated. Those tests were clearly not met here and the charitable exemption should be denied.

The opinion of the Chief Justice relies heavily on out-of-state cases, particularly from Missouri, *viz., Bader Realty and Investment Co. v. St. Louis Housing Authority,* 358 Mo. 747, 217 S.W.2d 489 (1949), and *Franciscan Tertiary Province v. State Tax Commission,* Mo., 566 S.W.2d 213 (1978). Yet in *Utah County v. Intermountain Health Care, Inc., supra,* a majority of this Court rejected the Missouri line of authority on charitable exemptions because it was held to be inconsistent with prior decisions of this Court in that it "contains no mention of the element of gift that this Court has held crucial to the meaning of charity." Further, the majority said

that the exemption granted to a hospital in the Missouri case of *Community Memorial Hospital v. City of Moberly*, Mo., 422 S.W.2d 290 (1967), was granted "largely on the basis of its non-profit structure."

In conclusion, in *Utah County v. Intermountain Health Care, Inc., supra*, precise and exact requirements were laid down for a charitable exemption. Now in the next case to follow, the requirements are clearly not met but a charitable exemption is granted upon the authority of out-of-state cases and the pre-*Utah County* case of *Friendship Manor Corp. v. Tax Commission*, 26 Utah 2d 227, 487 P.2d 1272 (1971). Our tax assessors and taxing authorities are left to ponder and apply inconsistent rulings of this Court, both made in the past six months.

STEWART, J., concurs in the dissenting opinion of HOWE, J.