*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 29**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SPORTS MEDICINE RESEARCH AND TESTING LABORATORY,
*Petitioner,*

*v.*

BOARD OF EQUALIZATION OF SALT LAKE COUNTY, STATE OF UTAH,
and UTAH STATE TAX COMMISSION,
*Respondents.*

No. 20220786
Heard March 11, 2024
Filed August 8, 2024

On Petition for Review of Agency Decision

Utah State Tax Commission
The Honorable Jane K. Phan
No. 20-1618

Attorneys:

Samuel A. Lambert, Bruce Olson, Salt Lake City, for petitioner

Bradley C. Johonson, Timothy A. Bodily, Deputy Dist. Att'ys,
Salt Lake City, for respondent Board of Equalization
of Salt Lake County

Sean D. Reyes, Att'y Gen., Michelle A. Lombardi, Asst. Att'y Gen.,
Erin T. Middleton, Asst. Solic. Gen., Salt Lake City, for respondent
Utah State Tax Commission

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1    The Utah Constitution provides that property owned by a nonprofit entity is not subject to property tax if it is "used exclusively for . . . charitable . . . purposes."[1] Petitioner Sports Medicine Research and Testing Laboratory (Sports Medicine) is a nonprofit entity and believes that its property in South Jordan meets those criteria. In support of its claim, Sports Medicine notes that each year it tests tens of thousands of blood and urine samples for government agencies and charitable organizations and that it provides those tests either for free or at a significant discount from market rates. In opposition to that claim, the respondents point out that Sports Medicine performs a similar number of tests for professional sports leagues and that the market rates Sports Medicine charges for those tests net it a significant profit.

¶2    While we acknowledge Sports Medicine's charitable intentions, the constitutional mandate that the property at issue be used exclusively for charitable purposes requires us to decide in favor of the respondents. Accordingly, we do not disturb the Tax Commission's denial of Sports Medicine's request for a property tax exemption.

## BACKGROUND

¶3    Sports Medicine is a research and testing laboratory that specializes in detecting performance-enhancing substances in bodily fluids and consumer products. Founded as a nonprofit organization in 2003, Sports Medicine's articles of incorporation state that it "shall be operated exclusively for charitable, scientific, and educational purposes." Per the same document, Sports Medicine seeks to achieve these goals by, among other methods, "promoting the use of effective drug testing as a deterrent to discourage athletes from using performance enhancing and other prohibited substances" and conducting "scientific research relating to the identification and development of effective testing procedures for performance enhancing substances."

¶4    As its articles of incorporation indicate, Sports Medicine's main functions are testing and research. Testing accounts for the majority of Sports Medicine's revenue, which in recent years has ranged from $9 to $12 million annually. Sports Medicine provides

---

[1] UTAH CONST. art. XIII, § 3(1)(f).

testing services to two groups in roughly equal measure. The first group consists of professional sports organizations, including the National Football League, Major League Baseball, and the United States Anti-Doping Agency. Tests for these organizations are performed at market rates. The second group consists of government agencies and nonprofit, charitable, and educational organizations. Testing for this second group is performed either for free or at discounted rates.

¶5    Sports Medicine uses data derived from its testing for research purposes. That research is publicly accessible, as required by the World Anti-Doping Agency, the international testing organization that accredits Sports Medicine. The research topics cover athletics as well as public safety. For example, Sports Medicine has published papers on the methods used to detect novel forms of performance-enhancing drugs as well as the medical effects of blood transfusions.

¶6    The property at the heart of this appeal is Sports Medicine's South Jordan facility, which was built in 2019. In 2020, Sports Medicine filed an application with the Salt Lake County Board of Equalization (Board), seeking to have the facility declared exempt from property tax. The Board denied the exemption on the ground that Sports Medicine's property was not used exclusively for charitable purposes. Sports Medicine appealed that decision to the Utah Tax Commission. The Tax Commission received briefs from Sports Medicine and the Board, held a hearing, and in 2022 affirmed the Board's decision. Sports Medicine sought judicial review. We have jurisdiction under Utah Code subsection 78A-3-102(3)(e)(ii).

## STANDARD OF REVIEW

¶7    Sports Medicine challenges the Tax Commission's legal conclusion that the South Jordan property was not used exclusively for charitable purposes. Per statute, we "grant the commission deference concerning its written findings of fact,"[2] and uphold those findings so long as they are "supported by substantial evidence based upon the record as a whole."[3] But we "grant the

---

[2] UTAH CODE § 59-1-610(1)(a).

[3] *Alta Pac. Assocs., Ltd. v. Utah State Tax Comm'n*, 931 P.2d 103, 108 (Utah 1997) (cleaned up).

commission no deference concerning its conclusions of law" and typically apply "a correction of error standard."[4]

## ANALYSIS

¶8 This court has heard cases regarding property tax exemptions for more than a century.[5] During that time, both the relevant constitutional language and our interpretation of that language has evolved. We begin by discussing those changes and how they inform our analysis of the charitable property tax exemption. We then apply that analysis to the facts of this case.

¶9 We are not persuaded that a property tax exemption is warranted. Sports Medicine's main argument on review is that it needs to perform tests on professional athletes in order to sustain its philanthropic mission. But even if we assume that to be true, Sports Medicine's decision to charge market rates for those tests generates revenue, and we have long categorized that use of property as non-charitable.[6] Sports Medicine's second argument is that a vacant portion of its property warrants an exemption because Sports Medicine intends to use it for charitable purposes in the future. While this argument finds some support in our caselaw, the Constitution does not permit a property tax exemption to be granted in the present based solely on the promise of charitable use in the future. Accordingly, we approve the Tax Commission's denial of a property tax exemption.

## I. ANALYSIS OF THE PROPERTY TAX EXEMPTION

¶10 While most taxes collected in Utah are imposed by statute, property tax has its roots in the Utah Constitution.[7] The language imposing a property tax has existed in the Utah Constitution since that document was ratified.[8] Also present in the constitution since that time is language granting property tax exemptions to certain types of property, among them properties that are "used

---

[4] UTAH CODE § 59-1-610(1)(b).

[5] *See, e.g.*, *Parker v. Quinn*, 64 P. 961 (Utah 1901).

[6] *See id.* at 962.

[7] *See* UTAH CONST. art. XIII, § 2 (establishing property taxes); *id.* art. XIII, § 4 (allowing the legislature to impose other taxes by statute).

[8] *See id.* art. XIII, § 3 (1896).

exclusively for ... charitable purposes."[9] Constitutional amendments in the twentieth and early twenty-first centuries added other categories of exemption[10] and moved the language regarding exemptions from section three to section two before moving it back to section three in 2002.[11]

¶11 Only one of these amendments altered the language of the charitable-use exemption. Prior to that amendment, which occurred in 1982, the charitable property tax exemption had required only that the property in question be "used exclusively for ... charitable purposes."[12] The 1982 amendment brought this language to its present form by adding the requirement that the property be "owned by a nonprofit entity."[13]

¶12 The way we have interpreted this constitutional language has likewise changed over time. For example, in the early-to-mid twentieth century, the definition of "used exclusively" was "gradually extended to the point that an exemption [was] allowed if the use of the property [was] *primarily*" charitable.[14] We rejected this "broadened interpretation[]" in *Loyal Order of Moose, No. 259 v. County Board of Equalization*, holding that "[t]he constitutional exemption is to be strictly construed."[15] Strict construction demanded that exemptions be allowed only when "the charitable use of the property [was] exclusive."[16] Any non-charitable use of a property defeated an exemption unless that use was "de minimus"—meaning "inadvertent or extremely minor."[17]

---

[9] *Compare id.* (1895), *with id.* (2024).

[10] *See, e.g.*, H.J.R. 18, 1986 Leg., Gen. Sess. (Utah 1986) (adding a property tax exemption for farm equipment).

[11] *See* S.J.R. 2, 1930 Leg., Spec. Sess. (Utah 1930); S.J.R. 10, 2002 Leg., Gen. Sess. (Utah 2002).

[12] UTAH CONST. art. XIII, § 2 (1981).

[13] *Compare id.* art. XIII, § 2(2)(c) (1983), *with id.* art. XIII, § 3(1)(f) (2024).

[14] *Loyal Order of Moose, No. 259 v. Cnty Bd. of Equalization*, 657 P.2d 257, 263 (Utah 1982) (cleaned up).

[15] *Id.* at 264.

[16] *Id.*

[17] *Id.* at 263–64.

¶13 While some cases, such as *Loyal Order*, have clarified the charitable exemption analysis, other cases have muddied the waters. Perhaps the most salient examples concern the inquiries into (1) whether a given use of property is charitable, and (2) whether the charitable uses of a property are exclusive. Under the relevant constitutional language these questions are conjunctive; to receive an exemption, the uses of property must be both charitable *and* exclusive.

¶14 Yet some of our cases seem to have read these questions as disjunctive. For example, in *Utah County ex rel. County Board of Equalization v. Intermountain Health Care, Inc.*, we set out several factors that "provide . . . useful guidelines for our analysis" of whether a nonprofit hospital's use of property was charitable.[18] But a few years later, we held that the outcome of that analysis alone determined whether a nonprofit hospital was "eligible for a charitable property tax exemption" without the need to also inquire into whether the charitable use of property was exclusive.[19]

¶15 The present case does not require us to confront every aspect of the charitable exemption analysis. But in order to clarify the applicable test, we lay out the steps of the charitable exemption analysis established by our caselaw.[20]

¶16 The first step in the analysis is to assess the uses the nonprofit entity makes of the property at issue. We have long recognized the commonsense proposition that a property may be used for more than one purpose.[21] Distinguishing between

---

[18] 709 P.2d 265, 269–70 (Utah 1985) [hereinafter *Intermountain*].

[19] *See Howell v. Cnty. Bd. of Cache Cnty. ex rel. IHC Hospitals, Inc.*, 881 P.2d 880, 885 (Utah 1994). Making matters worse, both *Intermountain* and *Howell* also suggested that a property could be exempt from property tax if the entity that owned it "meets the definition of a 'charity,'" regardless of how the property was used. *See Intermountain*, 709 P.2d at 269 (cleaned up); *Howell*, 881 P.2d at 884 (cleaned up).

[20] This analysis assumes that the property in question is owned by a nonprofit entity.

[21] *See, e.g.*, *Parker v. Quinn*, 64 P. 961, 962 (Utah 1901) (granting a charitable exemption to only one portion of a property based on a difference in usage); *Corp. of Episcopal Church in Utah v. Utah State*

(continued . . .)

multiple uses may be easier when the boundary falls along physical or temporal lines, but it is possible for the same area to be used in multiple different ways at the same time.[22]

¶17 The second step asks whether any of these uses serve a charitable purpose. Our cases propose two methods of answering this question,[23] though they do not specify which method should be applied in any given case.[24] But, as explained below, this case does not require us to resolve this disparity.[25]

¶18 Once the charitable uses of the property in question have been sorted from the non-charitable uses, the third step asks whether the non-charitable uses represent a more than de minimis share of the property's overall usage. If so, the property is not eligible for a charitable exemption.[26] There is only one exception, which applies if the portion of the property used for non-charitable purposes can be severed from the whole.[27] Where division is possible, it is "equitable and just" to hold that "the portion used and occupied for charitable purposes is exempt, and the portion not so used and occupied is subject to taxation."[28]

---

*Tax Comm'n*, 919 P.2d 556, 561 (Utah 1996) (stating that property was used for different purposes at different times).

[22] This case provides a good example of that scenario. Sports Medicine uses the same laboratory to test samples for both discounted and market-rate customers, and it stated at oral arguments that there was no meaningful way for this court to distinguish between those two uses of its property.

[23] *See Yorgason v. Cnty. Bd. of Equalization of Salt Lake Cnty. ex rel. Episcopal Mgmt. Corp.*, 714 P.2d 653, 657 (Utah 1986) (discussing the "traditional" test and the six *Intermountain* factors).

[24] *See id.* (applying the traditional test and stating that the *Intermountain* factors "consolidate some of the traditional factors considered by this Court"); *Howell*, 881 P.2d at 885 (stating that the *Intermountain* factors "determine whether an institution has bestowed a gift to the community" (cleaned up)).

[25] *Infra* ¶¶ 20–28.

[26] *See Loyal Order of Moose*, 657 P.2d at 264.

[27] *See Parker*, 64 P. at 962.

[28] *Id.*

## II. SPORTS MEDICINE DOES NOT QUALIFY FOR A PROPERTY TAX EXEMPTION

¶19  We resolve this case by applying the analysis outlined above. The first question in the analysis asks what uses Sports Medicine makes of its property. The Tax Commission's unchallenged factual findings identify three uses to consider. First, Sports Medicine uses its property to perform testing for government agencies and charitable organizations at a reduced rate. Second, it uses its property to perform testing for professional sports organizations at market rates. Third, Sports Medicine holds some of its space vacant to accommodate the need for future expansion.

¶20  The next question in the analysis asks whether any of these uses serve a charitable purpose. Sports Medicine contends that the first use—providing discounted testing to government agencies and charitable organizations—should be considered charitable. Because the respondents do not challenge that contention, we assume, without deciding, that Sports Medicine is correct.

¶21  The parties do contest whether Sports Medicine's second use—performing market-rate testing for professional sports organizations—serves a charitable purpose. Sports Medicine doesn't argue that this use is charitable in and of itself. It instead contends that its market-rate testing is "substantially related" to its charitable testing, and it offers two arguments as to why that relationship works in favor of granting a tax exemption.[29]

¶22  The first is that charging professional athletes market rates allows Sports Medicine to earn revenue, and this profit offsets the losses that it takes when it provides free or discounted tests. This argument fails as a matter of law. We held in *Parker* that using

---

[29] Sports Medicine also directs us to consider federal and state income tax laws that it argues incorporate the concept of "substantially related" business activity. *See, e.g.*, Treas. Reg. § 1.513-1; UTAH CODE §§ 59-7-801 to 802. But the constitutional language that establishes the charitable-use exemption is significantly different from the statutory language that Sports Medicine cites, *see* UTAH CONST. art. XIII, § 3(1)(f), and our caselaw firmly establishes that this language must be strictly construed. *See Loyal Order of Moose, No. 259 v. Cnty. Bd. of Equalization*, 657 P.2d 257, 264 (Utah 1982). We therefore decline Sports Medicine's invitation to seek guidance from these sources.

property solely to generate revenue does not serve a charitable purpose, even if the profits are used to support a charitable mission.[30] This isn't to say that a charity can't qualify for an exemption if it charges for its services; it can. But our caselaw distinguishes between charging below-market rates to charitable recipients and charging market rates to an undifferentiated group of customers.[31]

¶23 The second argument presents a closer call. Sports Medicine claims that its charitable mission requires both that its employees remain at the cutting edge of testing and detection and that they generate data regarding evolving trends in the use of illicit substances. That in turn requires that Sports Medicine's employees perform a high number of tests. And since the volume of tests Sports Medicine performs as part of its charitable function is limited, it must perform other tests to generate the data and experience it needs. Put simply, Sports Medicine contends that it needs to perform market-rate testing of professional athletes in order to fulfill its philanthropic mission.

¶24 Upon examination, this argument is legally insufficient for the same reason as the first. Even if we assume that Sports Medicine's need for data requires it to perform a large volume of tests on professional athletes, that need for data doesn't explain why Sports Medicine charges market rates for those tests.[32] The decision to charge market rates for those tests is motivated, as the Tax Commission held below, by the desire to produce profit. And as we held in *Parker*, profit generation is not a charitable use of property.[33]

---

[30] *Parker v. Quinn*, 64 P. 961, 962 (Utah 1901).

[31] *See Yorgason v. Cnty. Bd. of Equalization of Salt Lake Cnty. ex rel. Episcopal Mgmt. Corp.*, 714 P.2d 653, 659–60 (Utah 1986) (discussing the material reciprocity test and noting that "[a]n organization or institution may still qualify for a tax exemption even if some charges are made to the recipients . . . to help cover operating expenses, as long as these charges are not commensurate with the benefits provided").

[32] Indeed, it seems likely that Sports Medicine would be able to collect even more data and experience if it offered to perform all testing at below-market rates.

[33] 64 P. at 962.

¶25 This brings us to Sports Medicine's third use of its property: holding space vacant in anticipation of future expansion. Sports Medicine's argument regarding this use of its property is based on our holding in *Episcopal Church*.[34] In that case, a religious group that owned two plots of vacant land requested a tax exemption based on its plans to one day build a church on those plots.[35] We declined to set aside the Tax Commission's denial of that request, holding that the promise that property would be used for an exempt purpose in the future was insufficient to qualify for an exemption in the present.[36]

¶26 Sports Medicine argues that *Episcopal Church* supports its position because we held there that a property tax exemption could be granted only once construction on the vacant lot had begun. Because it is requesting an exemption for property on which construction has finished, Sports Medicine reasons, the standard established in that case has been satisfied. But this argument oversimplifies our holding.

¶27 In *Episcopal Church*, we were clear that "[t]he determination of whether a parcel of land is tax exempt does not turn on the property's level of development. Rather, the exemption hinges on the actual use of the property."[37] And the date that construction begins lacks talismanic significance: merely erecting walls does not a charitable use make. It mattered in *Episcopal Church* because the construction of a church would have served as a palpable manifestation of the religious group's intent to use its property for an exempt purpose.[38]

¶28 Here, by contrast, we know that Sports Medicine has not used this portion of its property for any charitable purpose since construction finished. That knowledge prevents us from drawing the conclusion we drew in *Episcopal Church*: that construction of a building "indicates that the property is irrevocably committed to

---

[34] *See Corp. of Episcopal Church in Utah v. Utah State Tax Comm'n*, 919 P.2d 556 (Utah 1996).

[35] *Id.* at 557.

[36] *See id.* at 560–61.

[37] *Id.* at 560.

[38] *Id.* ("Intention to use, without use, is not sufficient for exemption. The intention must be manifested by an affirmative act." (cleaned up)).

[an exempt] use, not simply held for future development."[39] Accordingly, we agree with the Tax Commission that the unused part of Sports Medicine's building is not being used exclusively for charitable purposes.

¶29  With the first and second steps of the exemption analysis complete, we now ask the final question: whether Sports Medicine's non-charitable uses of its property are more than de minimis. Our answers to the earlier questions make resolving this one straightforward.

¶30  Sports Medicine acknowledges that its market-rate testing represents approximately half of its laboratory usage and thus goes well beyond what could be considered a de minimis use. Because market-rate testing is not a charitable use, this portion of Sports Medicine's property is not eligible for a property tax exemption. And because keeping the other portion of its building vacant is likewise not a charitable use, we do not need to ask whether any part of Sports Medicine's property can be constructively severed from the whole.

**CONCLUSION**

¶31 The Utah Constitution's charitable-use property tax exemption applies only when a nonprofit entity uses its property exclusively for charitable purposes. Sports Medicine has not shown that its use of its South Jordan property satisfies that standard. Accordingly, we do not disturb the Tax Commission's denial of a property tax exemption.

─────────────

[39] *Id.* (cleaned up); *accord Utah County ex rel. Cnty. Bd. of Equalization v. Intermountain Health Care, Inc.*, 725 P.2d 1357, 1359–60 (Utah 1986) (granting a charitable-use exemption for the period when a hospital was under construction because the parties stipulated that the property was used exclusively for charitable purposes as soon as construction was completed).